# Wytheville

EMMETT RICHARD COLBERT v. ANNE ELIZABETH COLBERT.

June 14, 1934.

Present, Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

L. O. Wendenburg and S. Bernard Coleman, for the appellant.

William W. Butzner and C. O'Conor Goolrick, for the appellee.

HUDGINS, J., delivered the opinion of the court.

The appellee, Emmett Richard Colbert, filed his bill on February 15, 1932, against his wife, Anne Elizabeth Colbert, alleging desertion and adultery, praying for a divorce *a vinculo* and general relief. From a decree deny-

ing the divorce and awarding the custody of the infant daughter to the wife, this appeal was allowed.

Plaintiff and defendant were married in Fredericksburg, Virginia, on September 29, 1921. One child, Anne H., now nine years of age, was born to them May 2, 1925. This couple took a more or less active part in the social life of Fredericksburg, and entertained frequently, both at their home and at the Country Club, on which occasions drinks were served freely.

The first cloud upon their married happiness, so far as the record shows, appeared in the fall or winter of 1926, when Mr. Colbert, on returning from a short errand, noticed that one C. M. Cowan, whom he had left alone with his wife, seemed somewhat embarrassed. Cowan had been a close friend and a frequent visitor in their home. When he left on this occasion, Colbert asked his wife what was the trouble, and she replied that Cowan had tried to kiss her and she had ordered him out of the house. Colbert claims that he told Cowan that thereafter he must not visit his home unless specially invited by him. Cowan denies this and states that their friendship was as close and intimate after this affair as it was before, that he apologized to Mrs. Colbert, who accepted the apology, and he thought that ended the matter. Mrs. Colbert corroborated him in this statement.

The next incident, which finally and conclusively severed the friendship between Cowan and Colbert, occurred in the spring of 1927, when Colbert claims he saw Cowan kiss his wife, near the pool, at the Country Club. At that time a Mrs. Tucker, who was a guest in the home, was present. She, Cowan and Mrs. Colbert deny that Cowan was guilty of any undue familiarity on this occasion. At any rate, Colbert walked up and struck, or struck at, Cowan repeatedly. Thereafter neither spoke to the other. When the Colberts returned home they had angry words about the matter and Colbert seized a picture which his wife had of Cowan and tore it in pieces.

In June, 1929, another quarrel occurred between the

husband and wife because he was informed that she had been meeting Cowan in Richmond. All Colbert knew about this was that on the day in question both Cowan and Mrs. Colbert had gone to Richmond, though in separate conveyances.

On Saturday night before Easter Sunday, 1931, there was an entertainment at the Country Club, at which Mr. Cowan and Mr. and Mrs. Colbert were guests. All parties were drinking. It seems that Colbert and some of his friends remained in the back of the club house until he decided it was time to go home. He then walked into the music room and saw his wife and Cowan sitting together. Colbert requested his wife to leave and she replied that she was not ready. He then turned to Cowan and in a very dictatorial manner told him to move on, thus creating a scene in the presence of several other guests. He put his hand behind his wife's neck and insisted that she go home with him immediately, which she did. His wife resented the fact that he had created a scene at the Country Club and another serious quarrel took place between them. On the next day, or the Monday after Easter, his wife took their daughter and went to her mother's home in Fredericksburg, where she remained until Tuesday, when she phoned her husband for an interview. As a result of this interview, she returned with her daughter to her husband's home, he states with the distinct understanding that she would not speak to Cowan again.

On the occasion of the 250th anniversary of the founding of Fredericksburg the husband and wife had another quarrel because she went automobile riding with Cowan. She testified that when she returned home her husband, in the presence of guests, knocked her all the way upstairs and knocked her down on the bed five times. Colbert denies this and no one testified to the occurrence except Mrs. Colbert, who stated that next morning her husband apologized for his conduct of the night before.

The final break seems to have occurred on October 10 or 11, 1931, when Colbert returned from a fishing trip and found his wife away from home. About seven o'clock he phoned to her mother's home and was told that she was at the Country Club. He got in his automobile and started there for her. Just as he got outside of Fredericksburg he met her going home with a young lady. He turned around and followed them. Mrs. Colbert took the young lady home and then, instead of going directly to her own home, drove past Cowan's filling station, where she saw a group of young people, she blew her horn, drove around the block and back by the station, and again blew her horn. Some of the people waved to her as she passed. When she got home her husband asked her why she did not come straight back from the Country Club, and she replied that she did; he called her a liar and said that she drove past Cowan's place twice and blew her horn. Considerable argument followed.

Her husband stated that she told him she did not love him and did love Cowan and if she did not leave him Cowan would marry another woman. Her account of the affair is:

"Mr. Colbert then tried to slap me again, and I pushed him away and told him to take his hand off me; that I was not going to live with him any longer as his wife until the man I was in love with married some one else, and I think that was a very small thing to say to your husband, who was calling you a damn liar, trying to slap you in the face, and having your child cry, for merely blowing a horn at some people you knew very well."

This quarrel concluded with Mrs. Colbert expressing her determination to leave her husband. The evidence shows that they discussed what allowance the husband should make the wife for the support of herself and daughter, and finally two hundred dollars a month was agreed on, the husband says upon condition she would assign to him all her marital rights in his property, but no papers, then or subsequently, were executed.

On the next day Mrs. Colbert went with her daughter to Richmond and engaged board on west Franklin street, with the understanding with her husband that she would place the child in school and send her back to Fredericksburg every week-end.

While the wife testifies to other occasions on which she claims her husband did not show her proper respect, she admits that each of the quarrels hereinbefore enumerated was caused by the fact that he thought she was permitting Cowan to become too attentive to and familiar with her.

Colbert did not send the money as he had agreed, so she took the matter up with her attorney and shortly thereafter, on December 3, 1931, received a check for $250, with the stipulation that all of it should be spent on the daughter.

On the afternoon of January 29, 1932, Cowan was seen to leave Fredericksburg. Colbert called C. O. Burch, a private detective whom he had employed to watch his wife, and informed him that Cowan was going to Richmond, gave the license number of his car, and told Burch to follow Cowan upon his arrival. The detective located Cowan's car parked near the William Byrd Hotel, and about seven o'clock saw him get in the car and drive within a block of Mrs. Colbert's boarding house and stop. Soon after she came out and was seen to get in the car with Cowan. Burch followed them about a mile beyond the city limits and saw the car turn around and stop on the south side of Monument avenue, with the lights cut off. He then phoned to L. T. Wade, captain of police of Henrico county, who joined him, and together they returned to the parked car and after watching some ten minutes approached it from the rear, Wade on one side and Burch on the other. Wade turned his flash light on the car which revealed the parties in a rather compromising position.

They were arrested, charged with disorderly conduct, duly tried and acquitted.

Complainant contends that the chancellor erred in de-

clining to hold that respondent was guilty of adultery with Cowan on the night of January 29, 1932.

■ "Courts of equity are reluctant to convict husband or wife of unfaithfulness who for many years have lived together happily and maintained good reputations in the community, and they should not do so except upon the clearest and most convincing proof." *Schutte* v. *Schutte,* 90 W. Va. 787, 111 S. E. 840, 842.

To establish the charge of adultery the evidence must be full and satisfactory—the judicial mind must be convinced affirmatively. The proof should be strict, satisfactory and conclusive. *Throckmorton* v. *Throckmorton,* 86 Va. 768, 11 S. E. 289. See, also, *Johnson* v. *Johnson,* 154 Va. 788, 153 S. E. 670.

■ The testimony of a hired detective, in cases of this nature, should be carefully scrutinized and acted on with great caution. The detective in this case, on the day following the arrest, told Mr. H. M. Smith, a distinguished member of the Richmond bar who had been employed by Mrs. Colbert, that he saw nothing immoral in the action of Cowan and Mrs. Colbert on the night of January 29th. On the stand he testified that he knew the difference between disorderly conduct and adultery, and if he had caught the parties in the act of adultery he would not have hesitated to make the charge, that he did not charge adultery "because I did not have sufficient grounds."

L. T. Wade discussed the matter with Mr. W. W. Beverley, another well-known member of the Richmond bar who was employed by Mr. Cowan. Mr. Beverley stated that he asked Wade a great many questions. "* * * I asked him particularly if he saw anything immoral and he said he did not."

Two courts have passed upon the testimony of the hired detective and the police officer. The trial justice of Henrico found the parties were not guilty of disorderly conduct. The chancellor in the trial court refused to brand Mrs. Colbert an adulteress.

The testimony narrated and other matters detailed by the two witnesses, which we have purposely omitted, is sufficient to create a grave suspicion of immoral conduct, but in view of the fact that it is not denied that Cowan had on a heavy overcoat and Mrs. Colbert, wearing a short, tight dress and a long fur coat, was sitting on her left leg, the proof falls short of being as full, satisfactory and conclusive as is required to support the charge. We, therefore, find no error in this ruling of the chancellor.

■ We do think, however, that the chancellor erred in not granting a divorce *a mensa* on the ground of desertion.

Respondent contends that complainant is not entitled to a decree on this ground for two reasons, (1) because the separation was by mutual agreement, and (2) that complainant did not allege or prove that before instituting suit he offered to become reconciled to her.

It was established that after the quarrel on Saturday night before Easter Sunday, 1931, Mrs. Colbert left her husband for a few days and when she returned they occupied separate bedrooms; that in October, following, she stated to her husband that she was going to leave him and go to Richmond with their only child, and that she demanded separate support and maintenance for herself and child. The circumstances reveal that this was a fixed determination on her part. Colbert admitted that he did tell her he would furnish the money for her support, but this, followed by her subsequent conduct, is not sufficient to show such an agreement to separate as would bar the husband from maintaining a suit. As a matter of fact, he did not send her any money until she made demand therefor through her attorney.

■ The record in this case shows facts and circumstances which excuse the husband for not having sought a reconciliation before instituting suit. The bill alleges, and the evidence proves, that for five years following the marriage the parties lived together peacefully, contentedly and happily. The first serious trouble which oc-

curred between them was occasioned by the attention which Cowan was paying Mrs. Colbert. In spite of her husband's protests she continued to accept, if not encourage, these attentions for a period of five years, which was the direct cause of the final breach. During the last interview between the husband and wife, according to her own testimony, she told him, "I was not going to live with him any longer as his wife until the man I was in love with married someone else." The husband's version of this statement is that she said "she did not love me and did love Cowan and that if she did not leave me he would marry" another, naming the woman.

She told C. L. Ruffin, prior to this occasion, that she did not love her husband, but did love Cowan, and when he told her "she should be ashamed of herself, loving one man and living on another," she said she knew it but did not have the nerve to leave.

Within a month after the final separation of the husband and wife, the man who was the cause of the trouble between them and for whom the wife had repeatedly professed her love, sought a lawyer's advice about his will, and made a will naming Mrs. Colbert his sole beneficiary. After Mrs. Colbert moved to Richmond and while she was living on money obtained from her husband she continued to receive the attentions of this man, Cowan, and in order that her husband might not know of this, she would meet him at night a block, or more, from her boarding place, and drive with him around the city and its suburbs, until finally they were caught in an automobile parked in the dark, a mile, or more, from the city's limits, in each other's embrace. Both admitted this, but claimed it was the innocent manifestation of their love for each other. Cowan stated at the time of the arrest that he was in love with the woman and expected to marry her as soon as she obtained a divorce; on the stand he reiterated his expressions of love and his desire to marry her.

When a single man and a married woman, heedless of the continued protests of her husband, exhibit such

conclusive evidence of mutual love and affection, plus the failure of the wife to fulfill other marital duties, the peace and good order of society demand that the husband be released from further marital obligations. Under such circumstances, to require a husband or wife to offer to become reconciled to the other before instituting a suit for divorce is to demand too much of a self-respecting man or woman. The facts and circumstances bring this case within the exception stated in *Inman* v. *Inman,* 158 Va. 597, 164 S. E. 383, 386, thus:

"In *Sussman* v. *Sussman* [158 Va. 382, 163 S. E. 69], *supra,* this court recently said:

" 'While it has not been the universal practice to allege that an offer of reconciliation has been made, we think good pleading requires such an allegation in the bill of complaint. In any event, the proof must show that before instituting the suit complainant has offered to become reconciled. If the * * * proof fails to show that such an offer has been made, the concern of the court on all other questions is at an end, and a decree dismissing the bill should be entered.' This was a case in which the record established no facts which excused the plaintiff for not having sought a reconciliation with his wife. In order that there may be no misunderstanding of that case the court desires to make it plain that it did not intend by what is there said to intimate that there could be no facts and circumstances which would excuse a husband or wife for not having sought a reconciliation before filing suit for divorce on the grounds of desertion. But where such facts and circumstances exist they should be pleaded, and they must be proven to sustain the bill."

The next assignment of error is to the action of the court in awarding the custody of the infant daughter to respondent. This is a question which is always troublesome to the court. The evidence conclusively shows that both the father and the mother are devoted to their child. To deprive a girl of this tender age of the watchful care of either parent is a serious hardship, and in deciding

between the father and the mother the welfare of the child must be the dominant factor which controls the decision.

The record shows that the husband did not always act with moderation, and at times he permitted jealousy and temper, rather than wisdom, to dominate his actions. But the wife for some time prior to the institution of this suit signally failed to perceive, or, if she perceived, to fulfill, the duty which she owed to her husband and child. On the contrary, she permitted her love and affection for another man to dominate and control her conduct. It does not appear that she has sufficient income to take care of herself, and her future course of action is uncertain. The husband is established in business in Fredericksburg, owns a good home, and, while not wealthy, is able to support his child. The child is devoted to him. He both desires and is competent to give supervision to her training. Under all the circumstances narrated, it appears that the welfare of the child compels the court to entrust her care and custody to her father, who, although at times he has exhibited some of the frailties to which all flesh is heir, nevertheless has proven true to his marital obligation, and has recognized and faithfully performed the duty which, as a parent, he owes to his daughter.

The next assignment of error is to the action of the chancellor in allowing the attorneys for Mrs. Colbert a fee of $1,250 for representing her in these proceedings. The same attorneys ask an additional fee of $250 for their appearance in this court.

In a suit for divorce the wife is usually, and it is proper that she should be, allowed a reasonable sum, to be paid by the husband to counsel of her own choice. In this case the wife has been ably represented by two outstanding members of the bar, either one of whom, as has been demonstrated in numerous legal proceedings, was fully capable of representing her in this litigation. A husband should be required to pay only one attorney's

fee for his wife's counsel. The court in fixing a reasonable fee should not entirely ignore the financial condition of the husband. It is shown in this case that the husband is the business manager of a corporation in which all of the stock is owned by his father and mother, and that he is permitted to fix his own salary, which for the past two years seems to have been $4,000 per annum. He owns in his own right very little property. On his home, which cost between $15,000 and $20,000, there is a mortgage of $8,000, and he owes another debt of $4,000. His net income, after the payment of fixed obligations, does not exceed $2,500. Under these circumstances, we think that an allowance of $750 is ample for the representation of the wife in the lower court and in this court.

For the reasons stated, the decree of the lower court is reversed and the case remanded, with directions to the lower court to enter a decree granting the husband a divorce *a mensa,* and giving to him at this time the care and custody of the infant child; that proper provision be made in the decree for the mother to have the child at such time during the school year and vacation periods as the chancellor may determine; that the case be retained on the docket with full authority in the chancellor to transfer the care and custody of the child to the mother should later conditions justify such a course; and that the husband be required to pay the wife's attorneys the sum of $750 and no more, in full for their representation in this suit.

*Reversed and remanded.*

HOLT, J., dissenting:

Upon the evidence I am of opinion that there should be a decree *a vinculo.*