## Richmond

PHYLLIS MARIE WERTZ DOOLEY

v.

THURMAN WAYNE DOOLEY

June 12, 1981.

Record No. 790750

Present: All the Justices.

Diana M. Perkinson (Perkinson & Perkinson, on brief), for appellant.

David A. Bowers (Evans B. Jessee, on brief), for appellee.

THOMPSON, J., delivered the opinion of the Court.

In this appeal we are called upon to decide whether the trial court erred in denying spousal support to Phyllis Marie Wertz Dooley (wife) and in awarding custody of a seven-year-old son to Thurman Wayne Dooley (husband) on the ground of wife's adultery. The wife challenges the sufficiency of the evidence to support the charge of adultery.

The parties were married in Chesterfield, South Carolina, on October 11, 1970. The wife had been married twice previously, and had three children from those unions, two children by the first marriage who were in the custody of their father, and one child by the second marriage who was three years of age and in the custody of the wife at the time of her marriage to Dooley. The husband had been married once before and had one son who at the time of this suit was of majority age. There was one child born of the marriage, a son, Stephen, on October 22, 1971. When the parties separated, the husband was forty-five years of age, and the wife was thirty-one years of age. The husband, a dispatcher for a trucking company, earned $16,884 in 1978, or $12,129.13 net after taxes. Shortly before the parties separated, the wife obtained employment as a teacher of mentally retarded children, earning

$4,788 annual take-home pay, in addition to being a part-time college student.

On October 22, 1975, the wife filed a bill of complaint against the husband, requesting a divorce *a mensa et thoro* with leave to merge on the ground of constructive desertion. She also sought custody of the infant child born to the parties and spousal and child support. On October 31, 1975, the husband filed an answer denying the grounds of divorce and asking that he be awarded custody of the infant child. Following a hearing on November 17, 1975, the court awarded the wife temporary custody of Stephen, twenty dollars per week spousal support and forty dollars per week child support.

On April 16, 1976, the husband filed a petition seeking custody of Stephen, and thereafter an order was entered directing the Roanoke County Welfare Department to make an investigation as to the suitability of each of the parties to have custody of the child. The report of the investigator was filed on July 26, 1976.

The wife filed a petition on November 19, 1976, asking leave to file an amended bill of complaint for divorce on the additional ground that the parties had lived separate and apart without interruption for a period in excess of one year. On February 16, 1977, an order was entered allowing the husband to file a cross-bill for a divorce on the ground of one-year separation and referring the matter to a commissioner in chancery. The cross-bill alleged that the wife had been guilty of numerous acts which would constitute grounds for divorce and therefore she had forfeited any claim to support for herself.

The evidence was heard by the commissioner on April 7 and 28, 1977, May 19, 1977, and March 23, 1978. On December 18, 1978, the commissioner filed his report recommending (1) that the divorce be awarded to the wife on grounds of constructive desertion or one-year separation, (2) that no permanent spousal support be awarded to the wife because of then existing financial circumstances, with the court reserving the right to award spousal support in the future upon a change in circumstances and finding that the wife had been guilty of no marital misconduct which would bar her right to seek spousal support, and (3) that custody of the infant child be granted to the wife. Exceptions to the commissioner's report were filed by the husband on December 20, 1978, and by the wife on December 27, 1978.

An *ore tenus* hearing was held before the trial court on January 19, 1979, and on January 25, 1979, the court rendered its decision overruling the commissioner's report. On February 16, 1979, a final decree of divorce, pursuant to Code § 20-91(9)(a), was entered, the court concluding therein in pertinent part:

[T]he Court overrules the Commissioner's findings that the complainant has established grounds of divorce on the ground of cruelty tantamount to constructive desertion as of October 22, 1975, because (1) the Court finds the complainant was guilty of adultery during the month of September 1976, and on other occasions within the one (1) year period from October 22, 1975 . . . . The Court finds that the unexplained and undenied affairs . . . on at least two (2) occasions in September 1976, provided the opportunity and that the other evidence of other affairs from several sources established the adulterous disposition. Therefore, the Court finds that the complainant is not entitled to spousal support, because the defendant has grounds for divorce on adultery and it is so ADJUDGED, ORDERED and DECREED.

And it further appearing to the Court, considering all the circumstances of this case as expressed in his oral opinion given from the bench, that it is in the best interest of this child to award the defendant custody, on a probationary and conditional basis, it is so ADJUDGED and ORDERED . . . .

From this decree the wife appeals.[1]

The basic issue in the case at hand is whether the evidence supported the trial court's finding of the wife's adultery. In overruling the findings of the commissioner, the trial court felt that the commissioner "did not address himself to anything but the mental, physical and financial concerns, abilities of the parent, and was silent completely on the factor of morals."

The alleged incidents of adulterous behavior, occurring during the month of September, 1976, and on other occasions, were based upon the testimony of a private investigator hired by the husband on September 9, 1976. The private investigator testified that "Mr. Dooley retained me to check on the activities of his wife, Phyllis".

---

[1] At oral argument it was stipulated that the husband remarried a few days after the final decree and that the wife remarried approximately one year later.

After familiarizing himself with the area of the apartment complex wherein the wife resided, the investigator began his surveillance on September 13, 1976, at approximately 10:15 p.m. He had been previously instructed to look for a black automobile with Ohio license plates, and on this particular evening such a car was parked outside the wife's apartment. His testimony at the hearing before the commissioner revealed the following series of events:

> [T]his was 1:10 A.M. During this period of observance, the downstairs part of the apartment was completely dark. Occasionally, every hour or so a flash of light was observed momentarily, like a flash when a door is opened in a dark area, and closed again and at 12:45 a dim light came on downstairs. At 1:10 A.M., Mrs. Dooley and a man stood embraced and kissed in the open doorway of her apartment. The man got into the vehicle I was watching with the Ohio plates and departed . . . .

The investigator testified that the next time he watched the apartment was on the evening of September 19 and the morning of September 20, when the Ohio vehicle was again parked in front of the wife's apartment. This time the male driver of the vehicle departed at approximately 2:45 a.m., according to the investigator. The investigator's testimony revealed several other similar occasions involving the driver of the Ohio vehicle and also involving a male neighbor of the wife. The investigator concluded his surveillance on the evening of October 18, 1976.

The wife's explanation of these events at the commissioner's hearing was to the effect that she was separated from her husband and had been for almost a year and therefore she was allowed to date. She testified she had had several dinner dates subsequent to her separation, but denied having ever been with a man when living with her husband. While the male driver of the Ohio vehicle was not brought in as a witness, the male neighbor of the wife was. His testimony was to the effect that he and Mrs. Dooley were friends and neighbors only, even though they may have on occasion visited back and forth in each other's apartment.

At the hearing before the court on January 19, 1979, the husband called as a witness an attorney who had originally been counsel for the husband and had filed the husband's answer in this proceeding. This witness testified that he had begun seeing Mrs.

Dooley in August, 1977, and that their relationship had continued up to the time of the hearing. When asked whether he had ever spent the night at her apartment, the attorney conceded that he had "fallen asleep on occasion or two (2), and I'm very difficult to wake up, and so she would put a blanket on me, and I would be on the couch, and when I wake up I would leave." He also admitted that he had taken a couple of days off to visit with Mrs. Dooley and her children while they were vacationing at Myrtle Beach, South Carolina, during the summer of 1978. During her cross-examination, the wife admitted that the attorney had visited her at the beach, but maintained they had separate rooms in the same motel.

## I.  *Sufficiency of the Evidence.*

The commissioner in chancery, who heard all the evidence in the case except that presented during the *ore tenus* hearing before the trial court on January 19, 1979, concluded that the wife was not guilty of marital misconduct and was therefore not guilty of adultery. The additional evidence heard by the court only involved the course of conduct with the attorney who had originally represented the husband and was allowed to withdraw from the case by decree of the court within six months after the litigation was commenced. The trial court rejected the conclusions of the commissioner and adjudged that the wife's infidelity had been proven.

In *First National Bank of Martinsville, etc.* v. *Cobler,* 215 Va. 852, 854, 213 S.E.2d 800, 802 (1975), we said:

> Our standard of review under these circumstances should be kept clearly in mind, as the facts are considered . . . . The chancellor has disapproved the report of the commissioner in chancery, therefore, we must review the evidence and ascertain whether, under a correct application of the law, the evidence supports the findings of the commissioner or the conclusions of the trial court. [Citations omitted.]

*Cf. Higgins* v. *Higgins,* 205 Va. 324, 328, 136 S.E.2d 793, 796 (1964).

Earlier, in *Colbert* v. *Colbert,* 162 Va. 393, 400, 174 S.E. 660, 662 (1934), we stated these basic guidelines:

To establish the charge of adultery the evidence must be full and satisfactory—the judicial mind must be convinced affirmatively. The proof should be strict, satisfactory and conclusive. [Citations omitted.]

The testimony of a hired detective, in cases of this nature, should be carefully scrutinized and acted on with great caution . . . .

Later, in *Haskins* v. *Haskins,* 188 Va. 525, 530-31, 50 S.E.2d 437, 439 (1948), we quoted with approval:

A charge of adultery is one of a criminal offense and especially and uniquely damaging to the reputation of the party charged. The general and widely recognized presumption of innocence must be indulged against it, and, while it is not required to be proved beyond a reasonable doubt, as in a criminal proceeding, the evidence must be at least clear and positive and convincing. Raising a considerable or even strong suspicion of guilt is not enough. [Citation omitted.]

Both of these holdings were reiterated more recently in *Painter* v. *Painter,* 215 Va. 418, 420, 211 S.E.2d 37, 38 (1975).

■ While we agree that the behavior of the wife in the case at hand, when read in connection with all other evidence in the record, creates suspicion as to her guilt on the specific dates in issue, we do not believe the evidence amounts to clear, positive and convincing proof. "It creates grave suspicion as to the intimacy . . . . Yet when measured by the rules of human conduct and experience as of this day and time, it is not inconsistent with freedom from actual guilt." *Haskins,* 188 Va. at 531, 50 S.E.2d at 440.

We therefore hold that the trial court erred in its finding of adultery on the part of the wife as the evidence was insufficient to support the conclusion.

## II. *Custody of the Infant Child and Spousal Support.*

■ In deciding the issue of custody the trial court placed strong reliance on its finding the wife had been guilty of adultery.[2]

---

[2] On January 25, 1979, the court rendered its oral decision overruling the commissioner's report, saying in pertinent part:

As stated in the most recent case of *Brown* v. *Brown,* 218 Va. 196, at page 199, "The moral climate in which children are to be raised is an important consideration

In view of our conclusion that the charge of adultery has not been proven, we must reverse the judgment of the trial court and remand the case for the further consideration by it of the wife's right to spousal support from the time of the final decree, February 16, 1979, until her remarriage, and also for a redetermination of custody of the infant son in light of our holding on the issue of adultery and the relevant facts and circumstances that may have occurred since the aforesaid final decree.

*Reversed and remanded.*

POFF, J., dissenting.

I cannot endorse this opinion.

I agree that judgments cannot be based upon speculation, conjecture, surmise, or suspicion. But that is not to say that trial judges cannot base judgments on reasonable inferences drawn from proven facts. In my view, the evidence assembled by the commissioner in chancery and that heard by the chancellor, although wholly circumstantial, was fully sufficient to support the chancellor's conclusion that the wife committed multiple acts of adultery with several paramours while she had custody of a young, impressionable child.

When we review criminal convictions, we consistently apply the rules that circumstantial evidence may be sufficient to prove guilt beyond a reasonable doubt; that all conflicts in the evidence are resolved by the fact-finder; that the evidence and the reasonable inferences it raises are viewed in the light most favorable to the prevailing party; and that the trial court's judgment is presumed to be correct and is not to be disturbed unless plainly wrong. Presumably, we would apply these rules reviewing a conviction for the crime of adultery. By what curious logic do we ignore them when we review findings of fact based upon conflicting evidence of adultery in a civil case where the standard of proof is lower?

for the Court in determining custody, and adultery is a reflection of a mother's moral values. An illicit relationship to which minor children are exposed cannot be condoned," and I don't intend to condone it, and "such a relationship must necessarily be given the most careful consideration in a custody proceeding." . . . . The mother in this case then, in my judgment, has forfeited her right to custody by her choice of values . . . .

In my judgment, therefore, it's the best interest of this child to award the father custody, but it's going to be on a probationary and conditional period.

I believe the rule in *Haskins* v. *Haskins,* 188 Va. 525, 50 S.E.2d 437 (1948), borrowed as it was from the editorial conclusions of two legal commentators, *id.* 188 Va. at 530-31, 50 S.E.2d at 439, is jurisprudentially flawed. Parenthetically, I confess error for having joined in an opinion which applied it. *Painter* v. *Painter,* 215 Va. 418, 211 S.E.2d 37 (1975). So long as we continue to impose the *Haskins* rule upon trial courts, an adulterous spouse will suffer no civil consequences, monetary or otherwise, unless the innocent spouse can produce a confession of one of the guilty participants or the testimony of an eyewitness.

I would overrule *Haskins* and its progeny and affirm the judgment below.