# COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Lorish and Frucci
Argued at Norfolk, Virginia


ALBERTO MANUEL MIRELES

                                          MEMORANDUM OPINION[*] BY
v.       Record No. 0935-24-1         JUDGE RICHARD Y. ATLEE, JR.
                                               OCTOBER 7, 2025

MORGAN HORNSBY MIRELES


FROM THE CIRCUIT COURT OF GLOUCESTER COUNTY
Jeffrey W. Shaw, Judge

Douglas J. Walter (Lisa A. Mallory; Clancy & Walter, P.L.L.C., on
briefs), for appellant.

Breckenridge Ingles (Martin, Ingles & Hensley, Ltd., on brief), for
appellee.


This appeal involves the divorce of Alberto Mireles ("husband") and Morgan Mireles

("wife").[1] The circuit court granted the divorce on the grounds of adultery and entered an order

distributing the parties' property. Husband contends that the evidence was insufficient as a matter

of law to prove that he committed adultery. He also challenges the equitable distribution award,

arguing that wife's assault and battery of him was a negative nonmonetary contribution, that the

child tax credits claimed by wife were a marital asset, and that the circuit court erred by awarding

wife 52.5% of the marital assets. Finally, he argues the circuit court abused its discretion by

ordering him to pay $20,000 of wife's attorney fees. For the following reasons, we disagree and

affirm the decision of the circuit court.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] We recognize that "former husband" and "former wife" are more accurate designations.
Nevertheless, we use these less cumbersome titles in this memorandum opinion for ease of
reference.

UNPUBLISHED

# I. BACKGROUND

Husband and wife married in October 2015, and they had two children during the marriage. Husband served in the Navy during the marriage, causing the parties to move often. Wife worked as an LPN for a time, but she did not work outside the home after the children were born until March 2020, when she went back to work as an LPN. By January 2021, the parties were living in Virginia. Husband and wife separated following an incident late at night on June 19, 2021, extending into the early morning hours of June 20.

## A. *The Events Leading to the Divorce*

In late April or early May 2021, husband started coming home late from work. Rather than getting home around 5:00 p.m., he would arrive between 8:00 p.m. and 9:00 p.m. When asked about the change, husband said that "he was really busy" with things going on at work.

At some point, wife became concerned that husband was having an inappropriate relationship with Corinna Ramos, a "junior sailor[] he supervised" at Norfolk Naval Base. She discovered a conversation that took place in late May between husband and Ramos over Facebook Messenger. Wife found the messages concerning because husband "said the same things to [Ramos] that he used to tell [wife]," such as "I swear that finally being able to see you . . . is the only reason I look forward to going to work." She confronted husband, and he told her that he and Ramos were "just friends." Wife told husband that you do not tell a friend the "same things that you would tell your wife," and she asked him to "limit his relationship with [Ramos] to work only." Husband agreed, and he messaged Ramos that "after speaking with [his] wife," his and Ramos's prior conversations were "completely inappropriate" and that they "should keep [their] relationship as professional as possible."

Ramos first responded that she could not help husband with work because she did not want "wife to think that we have anything more than a work relationship!" But she later messaged

- 2 -

husband, "I can't believe you haven't said anything. Some man you are! Don't ever speak to me again." She then tried to call husband, but he told her he could not "feed any input into this situation" because he did not want to escalate things. Ramos asked him why he did not tell the truth, and he answered, "In process[.]" She responded, "I told you to control your bitch[.]"

Late on the evening of June 19, 2021, wife and husband were lying in bed with the lights off, getting ready to go to sleep. Around midnight, husband's phone dinged. Suspecting it was Ramos, wife leaned over to see who it was. Husband tried to hide the phone from wife, but she saw that it was in fact Ramos, wishing husband a happy Father's Day. Wife got up, went downstairs, and went outside to "cool off."

While downstairs, wife texted Ramos. She obtained Ramos's number from a card husband had with his unit members' phone numbers. She sent Ramos a message asking Ramos to stop texting her husband in the middle of the night. Ramos responded that she had sent the same message to "all of the men she worked with," not just husband. Wife told Ramos to stop having conversations with husband, but Ramos denied that anything was going on. Wife asked Ramos about a dinner that Ramos and husband were supposedly at to celebrate Ramos as sailor of the year, but Ramos denied having a celebration or going out to a dinner.

After the first few text messages, Ramos called wife and confronted her, asking, "[w]ho do you think you are texting me like that." Ramos also told wife "Bitch, you don't know who I am. I know where you live. Come F with me." Wife hung up on her. Ramos attempted to call husband several times, but he did not answer. At that point, Ramos started texting wife again and "finally admitted to what they had been doing."

Through text, Ramos told wife, "Actually[, w]e did go out[.] Since he doesn't want to say anything to me[.]" She said that she was not playing husband's game. Wife asked if they had gone out by themselves, and Ramos responded, "[n]umerous times[.]" She denied that they were

together, but she also said, "We're supposed to go out on Monday, but you can tell him that I'm good[.]" Wife responded, "He said you were supposed to meet up to discuss the qual cards[.]" Ramos "laughed" at the comment and said "On my day off? Highly unlikely[.] Whatever you want to know, I'll tell you[.]" Wife asked to know everything. Ramos told her that husband planned to move out after his sister's wedding and that he had already found a place. She also told wife, "We were together . . . all the times you called and he didn't answer[.]" She also said, "If he wants to lie . . . I have proof[.]" Wife asked for the proof, and Ramos asked wife to call her. Ramos later refused to provide proof.

At some point, husband came downstairs and was with wife outside. Wife told him to call Ramos back. Husband did, and he put her on speakerphone. Ramos told husband to "be a man and tell your wife the truth. Quit being a pussy and tell her that we were going to be together after your sister's wedding and move in together." When wife asked if that was true, husband responded "somewhat" before explaining that he had not been happy for a decade and he wanted to leave her years ago. And based on information Ramos received from "credible sources," husband did not believe the children were his. Wife told him she had given him "numerous chances to stop this inappropriate relationship" but that this was his "third strike" and she was reporting him to his command. Wife asked husband to leave.

Later in the evening on June 20, husband was packing his stuff to leave. After wife put the kids to bed, things escalated. Wife was upset that husband was only packing things like electronics, but that he had put the Father's Day card and cake from the kids next to the trash can outside. Things turned physical, and wife called the police. Wife was arrested and charged with assault and battery of a family member.[2]

---

[2] Wife later entered into a plea agreement on the charge. She pled not guilty, but she stipulated that the facts were sufficient to find her guilty. She was given a deferred disposition requiring her to be on good behavior for two years.

In August, wife was sleeping, when husband called her around 2:00 or 3:00 a.m. Thinking something was wrong, wife answered. Husband asked if she had a moment to talk, but then Ramos "took over the conversation[ and] started yelling obscenities." Ramos cursed at wife about reporting Ramos to Ramos's command for adultery, and she reminded wife that she knew where wife lived. Wife hung up and called husband back, hoping to speak to him. But Ramos answered and again yelled obscenities at wife. Wife told Ramos she was tired, she had two kids to take care of, and she did not have time for "these childish games." Ramos responded, "you don't have time for this? Bitch I'm about to F[uck] your husband." Husband said nothing in response to this comment.

Wife received multiple calls from both husband's number and Ramos's number. Because of the phone calls, she reported them to husband's command. Wife never caught husband and Ramos together, and husband never admitted to the affair. Wife filed for divorce on August 31, 2021, seeking a divorce on the grounds of husband's adultery with Ramos.

As part of the divorce proceedings, both husband and Ramos were deposed. Husband denied any relationship, sexual or otherwise, with Ramos. He denied interacting with Ramos "on a routine basis." He acknowledged that he received a text from Ramos wishing him a happy Father's Day, and he acknowledged that an argument ensued. He claimed wife "physically assaulted" him and refused to return his phone. He did not recall whether wife accused him of having sex with Ramos. Nor did he recall the contents of the conversation between wife and Ramos. He denied hearing most of the comments that wife claimed Ramos made. He also denied admitting to a relationship with Ramos.

Ramos answered basic questions, but when it came to questions about her relationship with husband, she pled the Fifth Amendment and refused to answer any questions. She pled the Fifth Amendment to questions ranging from whether she had seen husband socially outside of work to

those relating to whether she had a sexual relationship with him. She also pled the Fifth Amendment and declined to answer any questions about the text messages and phone calls between herself and wife.

B. *The Divorce Proceedings*

Wife filed for divorce in August 2021. She sought equitable distribution of the parties' marital property, spousal and child support, and custody of the children. Husband filed an answer and counterclaim, denying the adultery. He also sought equitable distribution, custody of the children, and spousal and child support.

The court entered a pendente lite order reflecting that the parties had reached a pendente lite agreement as of December 3, 2021. Per the agreement, the order granted wife sole legal and primary physical custody, while husband had visitation. The order also provided that "[a]ll child tax credits shall be paid to [w]ife on or after December 3, 2021. Any such checks shall be endorsed by [h]usband to [w]ife."

On May 16, 2022, the trial court entered a pretrial order reflecting the matters discussed during the parties' pretrial conference. It set out the property to be distributed as part of the equitable distribution of the parties' property. Husband later filed a motion seeking to amend the pretrial order to include, among other things, both husband's and wife's 2021 tax refunds. The trial court denied the motion. It found that the "additional property," i.e., the tax refunds, "was known to the parties at the time of the hearing." Thus, it found that there was not good cause to add the requested property.

Following an October 31, 2022 hearing on the grounds for divorce, equitable distribution, and spousal support, the trial court issued a memorandum opinion setting out its findings. It later incorporated its findings in a divorce decree entered on August 25, 2023. The court found that wife had proven by clear and convincing evidence that husband had committed adultery, and it granted

her a divorce on the grounds of adultery. When making the equitable distribution award, the court considered the factors in Code § 20-107.3(E) as required. In doing so, it found that husband's adultery was a "negative nonmonetary contribution to the well-being of the family." The court did not mention the physical altercation that led to wife's charge for assault and battery. Ultimately, it awarded wife 52.5% of the net equity in the marital assets.

The court also recognized that wife claimed various tax credits related to the children on her 2021 tax return, which resulted in her receiving approximately $19,000 attributable to those credits as part of her tax return. The court noted that husband "challenge[d] this conduct," but it found that wife's actions were contemplated by the parties' agreement reflected in the pendente lite order, which provided that the child tax credits were to be paid to wife.

Nearly a year later, on October 13, 2023, the court conducted a hearing to determine custody of the children. The court awarded sole legal custody of the children to wife, with husband getting visitation. The court retained the case on the docket to determine child support and attorney fees.

Following another hearing, the trial court entered an order setting child support and awarding attorney fees. The court found that wife's monthly income was $5,350, while husband's monthly income was $8,895.15. It ordered husband to pay wife's attorneys $20,000 in attorney fees. Husband objected to the award. He made two arguments. First, he argued that the parties' incomes are roughly equivalent if child support is considered, and second, he argued he did not have the ability to pay because of his support obligations, the equitable distribution award, his own attorney fees, and his debt. Husband now appeals the court's various rulings.

II. ANALYSIS

A. *The trial court did not err in granting the divorce on the grounds of husband's adultery.*

Husband argues that the evidence was insufficient to prove that he committed adultery, and thus, he contends that the trial court erred by granting wife a divorce on the grounds of adultery. We disagree.

"One who alleges adultery has the burden of proving it by clear and convincing evidence." *Hughes v. Hughes*, 33 Va. App. 141, 146 (2000) (quoting *Seemann v. Seemann*, 233 Va. 290, 293 (1987)). Our Supreme Court has defined clear and convincing evidence as "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Fred C. Walker Agency, Inc. v. Lucas*, 215 Va. 535, 540-41 (1975) (quoting *Cross v. Ledford*, 120 N.E.2d 118, 123 (Ohio 1954)). Thus, "[s]trongly suspicious circumstances are insufficient. Care and circumspection should accompany consideration of the evidence." *Watts v. Watts*, 40 Va. App. 685, 689 (2003) (quoting *Romero v. Colbow*, 27 Va. App. 88, 93-94 (1998)). "[I]n determining whether clear and convincing evidence supports a finding of adultery, the Supreme Court and this Court have consistently reviewed the record to determine not only whether the evidence merely established suspicious conduct, but also whether a credible explanation existed for the circumstances." *Hughes*, 33 Va. App. at 150.

"[W]hile a court's judgment cannot be based upon speculation, conjecture, surmise, or suspicion, adultery does not have to be proven beyond a reasonable doubt." *Watts*, 40 Va. App. at 689 (quoting *Gamer v. Gamer*, 16 Va. App. 335, 339 (1993)). "Rather, the evidence must 'produce in the mind of the trier of facts a firm belief or conviction as to the allegations [of adultery] sought to be established.'" *Id.* at 689-90 (alteration in original) (quoting *Cutlip v. Cutlip*, 8 Va. App. 618, 621 (1989)). "It is well settled, however, that such proof may be by

circumstantial as well as direct evidence." *Id.* at 690 (quoting *Bowen v. Pernell*, 190 Va. 389, 393 (1950)).

We find that this case is similar to *Watts*, 40 Va. App. 685. In *Watts*, the husband started coming home late from work at night, and he took a change of clothes with him to work. *Id.* at 690-91. He was constantly checking his phone, and the wife overheard her husband tell someone on the phone that he loved and missed them. *Id.* at 691. The wife hired a private investigator, who observed the husband and another woman kiss as well as spend time alone in a residence. *Id.* at 691-92. When asked questions during the subsequent divorce proceedings, the alleged affair partner either invoked the Fifth Amendment or claimed not to remember. *Id.* at 693. The husband denied the visits with the alleged affair partner. *Id.* at 696. This Court found that the evidence was sufficient to prove adultery, and it noted that husband provided no explanation for the circumstances. *Id.* at 696-97.

Here, like in *Watts*, husband's behavior changed. He started coming home late from work and getting late night messages and calls on his phone. Likewise, wife here discovered that husband had made inappropriate comments to the suspected affair partner; comments that wife described as similar in nature to those he used to make to her. The nature of husband's messages with Ramos, as well as the numerous late night phone calls, contradict husband's argument that his relationship with Ramos was a work relationship. In addition, after the text messages and phone call where wife confronted Ramos, husband made an indirect admission, acknowledging that Ramos's story was "somewhat" true.

Although wife did not witness husband and Ramos together, nor did she hire a private investigator, she received multiple phone calls from husband and Ramos while they were together. Ramos admitted to wife that she was alone with husband numerous times. Ramos also sent numerous messages and made comments telling husband to be a man and tell wife the truth about

them. Further, wife received a late-night phone call from husband, during which Ramos came on the phone, demonstrating that Ramos and husband were together, and Ramos told wife that she was "about to F[uck] your husband." Husband said nothing in response to that comment. Thus, while husband and Ramos were not seen together alone in a residence late at night like the couple in *Watts*, the call and comments establish a similar inference. Although this incident occurred after the parties separated, in the context of the other evidence, it leads to an inference that adultery did in fact occur prior to the parties' separation.

Additionally, like the affair partner in *Watts*, Ramos pled the Fifth Amendment to any question that touched on her interactions or relationship with husband. Although husband argues that it does not lead to any adverse inference because Ramos asserted the privilege so broadly, it is best left to the factfinder, what weight, if any, to give Ramos's decision to plead the Fifth Amendment. *See* Code § 8.01-223.1 ("[I]f a party or witness refuses to answer a question about conduct described in subdivision A (1) of § 20-91 [grounds for divorce] or in § 18.2-365 [adultery statute] on the ground that the testimony might be self-incriminating, the trier of fact may draw an adverse inference from such refusal."). And a reasonable factfinder, considering her decision to plead the Fifth Amendment in the context of the other evidence, could find an adverse inference from her decision to do so.

Husband denied the affair, but like the husband in *Watts*, he was unable or unwilling to provide an explanation for the circumstances. *See Coe v. Coe*, 225 Va. 616, 622 (1983) (noting that the allegation of adultery was denied but that the accused spouse could present no evidence that contradicted or explained the circumstances).

Husband contends that there are cases in which the appellate courts "found the evidence of adultery to be lacking when the evidence was far more suspicious than this case." But those cases are distinguishable because of their posture on appeal. For example, in *Painter v. Painter*, 215 Va.

418, 420 (1975), cited by husband, the trial court found the evidence insufficient, and it was affirmed on appeal. "In those cases, as here, on appellate review a trial '[court's] finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" *Watts*, 40 Va. App. at 695 (alteration in original) (quoting *Pommerenke v. Pommerenke*, 7 Va. App. 241, 244 (1988)). Likewise, in *Romero*, where we did reverse, the commissioner in chancery, who heard the evidence, and the trial court came to different conclusions about the evidence, and thus, our level of deference was different. *See Romero*, 27 Va. App. at 93 (noting that even where the court has rejected the commissioner's findings of fact, we give "due regard to the commissioner's ability, not shared by the [court] to see, hear, and evaluate the witnesses at first hand" (quoting *Robinson v. Robinson*, 5 Va. App. 222, 226 (1987))); *see also Dooley v. Dooley*, 222 Va. 240 (1981) (reversing a finding of adultery where the trial court and commissioner in chancery came to different conclusions). Reviewing the record here, under the proper standard of review, we find that wife has established husband's adultery by clear and convincing evidence. Thus, the trial court did not err in granting her a divorce on the grounds of adultery.

B. *The trial court did not err in its equitable distribution rulings.[3]*

    1. Standard of Review

"[A]ll trial court rulings come to an appellate court with a presumption of correctness." *Sobol v. Sobol*, 74 Va. App. 252, 272 (2022) (alteration in original) (quoting *Wynnycky v. Kozel*, 71 Va. App. 177, 192 (2019)). "Because making an equitable distribution award is often a difficult

---

[3] Husband argues that the trial court erred by awarding wife 52.5% of the marital assets in equitable distribution. He ties his argument for this assignment of error to two of his other arguments. Specifically, he argues that the trial court considered his adultery, of which he contends there is insufficient evidence, and failed to consider wife's assault and battery of husband. Because we find that the evidence was sufficient to establish husband's adultery and that the record does not establish that the trial court failed to consider wife's assault and battery, we likewise find that the trial court did not err in making its equitable distribution award.

task, 'we rely heavily on the discretion of the trial judge in weighing the many considerations and circumstances that are presented in each case.'" *Id.* (quoting *Howell v. Howell*, 31 Va. App. 332, 350 (2000)). Thus, on review, an "equitable distribution award will not be overturned unless the [appellate court] finds 'an abuse of discretion, misapplication or wrongful application of the equitable distribution statute, or lack of evidence to support the award.'" *Dixon v. Dixon*, 71 Va. App. 709, 717-18 (2020) (alteration in original) (quoting *Anthony v. Skolnick-Lozano*, 63 Va. App. 76, 83 (2014)).

2. Wife's Assault and Battery of Husband

Husband argues that the trial court abused its discretion when it failed to find that wife's assault and battery of husband constituted a negative nonmonetary contribution to the well-being of the family. We disagree.

"The purpose of Code § 20-107.3 is to divide fairly the value of the marital assets acquired by the parties during marriage with due regard for both their monetary and nonmonetary contributions to the acquisition and maintenance of the property and to the marriage." *O'Loughlin v. O'Loughlin*, 20 Va. App. 522, 524 (1995). The court makes a division of property after considering a statutory list of factors. *Watts*, 40 Va. App. at 697. Subsection (E)(1) permits the court to consider "the contributions, monetary and nonmonetary, of each party to the well-being of the family." Code § 20-107.3(E)(1). Consideration of nonmonetary contributions does not require a party to show an "adverse economic impact." *Watts*, 40 Va. App. at 699. Rather, "[i]n that context, the 'wellbeing' of the family relates to the effect on the family's emotional welfare and condition." *Id.* While this is not intended to be "a vehicle to punish behavior, the statutory guidelines authorize consideration of such behavior as having an adverse effect on the marriage . . . ." *O'Loughlin*, 20 Va. App. at 527.

- 12 -

Husband argues that even if the court "did not assign significant weight" to wife's conduct, "it should have been a consideration and noted as such." But the trial court's ruling comes to us "with a presumption of correctness." *Sobol*, 74 Va. App. at 272 (quoting *Wynnycky*, 71 Va. App. at 192). And nothing in the record suggests that wife's conduct was not considered. Although a trial court is required to consider the factors set out in Code § 20-107.3(E), "it 'need not quantify or elaborate exactly what weight was given to each of the factors' as long as its 'findings . . . [are] based upon credible evidence.'" *Rinaldi v. Rinaldi*, 53 Va. App. 61, 76 (2008) (alterations in original) (quoting *Taylor v. Taylor*, 5 Va. App. 436, 444 (1988)). That the court did not mention wife's conduct or quantify the weight given does not mean that the court did not consider it.

Beyond that, the trial court did not abuse its discretion when it did not find that wife's conduct was a negative nonmonetary contribution. There is no evidence that wife's assault and battery contributed to the breakdown of the well-being of the family or otherwise superseded the impact the adultery already played. Wife had already discovered husband's adultery, and she had already asked husband to leave the home. He was packing to leave the home when the incident occurred. Wife's conduct was an undignified and unfortunate reaction to husband's adultery. We do not mean to suggest that wife's conduct was acceptable, but a reasonable factfinder could conclude that wife's assault and battery of husband did not negatively impact the well-being of the family because the marriage, and the well-being of the family, had already broken down because of husband's adultery. Thus, we find that the trial court did not abuse its discretion by failing to find wife's conduct constituted a negative nonmonetary contribution to the well-being of the family.

3. Wife's Tax Refund

Under Virginia law, equitable distribution consists of three separate steps: classification of property, valuation, and distribution. *Hamad v. Hamad*, 61 Va. App. 593, 602 (2013); Code § 20-107.3. "Property can be classified as marital, separate, or hybrid. Hybrid property involves a

mixture of 'part marital property and part separate property.'" *Hamad*, 61 Va. App. at 602 (quoting Code § 20-107.3(A)(3)).

Wife received a significant tax refund for tax year 2021, largely because she claimed multiple tax credits related to the children. Husband incorrectly argues that the trial court should have found that either the child tax credits themselves or wife's tax refund should have been classified as marital property.

Here, the trial court did not classify the tax refund as part of its equitable distribution award because it was not properly identified as an asset subject to equitable distribution. In preparation for trial, the parties filed property schedules identifying the assets for equitable distribution. After a hearing, the trial court entered a pretrial order, endorsed by both parties, identifying the assets that would be subject to equitable distribution at trial. Neither the property schedules nor the pretrial order mentioned either husband or wife's 2021 tax refunds. Though husband later sought to amend the pretrial order to include the parties' 2021 tax refunds, the trial court found that the property "was known to the parties at the time of the hearing." The trial court acknowledged that in some cases known property may be added late, but it found that good cause did not exist in this case to add the property late, and it denied the motion. While husband may not have been aware of the exact value of the refunds at the time of the pretrial hearing, he would have known about the possibility of a tax refund. Although the trial court could have permitted the amendment, nothing in the record leads us to conclude that the trial court erred by denying the motion to amend and refusing to include the tax refund in the list of property to be distributed.

Husband acknowledges in his reply brief that the court denied his motion to amend. But he argues that the court nonetheless received evidence on the issue and ruled on it in its memorandum opinion. Thus, he contends that the issue is properly before us.

- 14 -

But the trial court did not consider the tax refund as property to be classified and distributed. Code § 20-107.3(E) requires the court to consider a list of factors as part of the equitable distribution process. The memorandum opinion indicates the trial court considered the dispute over the tax refund as an "other factor" to consider "to arrive at a fair and equitable monetary award." *See* Code § 20-107.3(E)(11) (requiring the court to consider "[s]uch other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable monetary award"). Thus, the trial court did not reconsider its earlier ruling that the tax refund was not an asset to be distributed.

Even assuming this qualifies as ruling on the issue as husband argues, the trial court did not err in finding the pendente lite order permitted wife to claim the tax credits. "[T]rial courts have the authority to interpret their own orders." *Davis v. Commonwealth*, 70 Va. App. 722, 732 (2019) (alteration in original) (quoting *Fredericksburg Constr. Co. v. J.W. Wyne Excavating, Inc.*, 260 Va. 137, 144 (2000)). And we will defer to that interpretation so long as it is reasonable. *Id.*

Here, the pendente lite order, which was an agreed upon order, specifically provided that "[a]ll child tax credits shall be paid to Wife on or after December 3, 2021. Any such checks shall be endorsed by Husband to Wife." The trial court interpreted this order to mean wife was permitted to claim the child related credits and keep the refund. Nothing in this language or the record suggests that the trial court's interpretation of this order was unreasonable. Accordingly, we find that the trial court did not err by refusing to classify wife's tax refund as a marital asset subject to distribution.

C. *The trial court did not err awarding wife attorney fees.*

Husband argues that the trial court abused its discretion by ordering husband to pay $20,000 of wife's attorney fees.

"Whether to award attorney fees in divorce proceedings is 'a matter submitted to the sound discretion of the trial court and is reviewable on appeal only for an abuse of discretion.'" *Randolph*

*v. Sheehy*, 76 Va. App. 356, 370 (2023) (quoting *Northcutt v. Northcutt*, 39 Va. App. 192, 199-200 (2002)).

> In deciding whether to award attorney fees in a divorce matter, a trial court may consider the "unique equities of each case," and may consider factors including "ability to pay a fee, the party's degree of fault in bringing about the dissolution of the marriage, and whether the party unnecessarily increased litigation costs through unjustified conduct."

*Yazdani v. Sazegar*, 76 Va. App. 261, 273 (2022) (quoting *Rinaldi*, 53 Va. App. at 78). "The award must be reasonable 'under all of the circumstances revealed by the record.'" *Id.* (quoting *Sobol*, 74 Va. App. at 288).

Here, the trial court expressly stated that it considered the "financial positions of the parties, their degree of fault, their incomes, assets, ability to pay, the bona fide claims of the parties, [and] the time expended by counsel" prior to making the award. Thus, the trial court considered the unique equities of the case. Nothing in the record suggests that the trial court abused its discretion in making such an award. Husband's gross income of $8,895.15, was greater than wife's gross income of $5,350. Husband's adultery contributed to the dissolution of the marriage. Furthermore, husband increased the cost of litigation by failing to respond to discovery, resulting in three motions to compel. We find no evidence to suggest that the trial court's award was an abuse of discretion. Accordingly, we affirm the trial court's award.

D. *Attorney Fees on Appeal*

Both parties request attorney fees for the fees that each has incurred on appeal.

"The decision of whether to award attorney's fees and costs incurred on appeal is discretionary." *Friedman v. Smith*, 68 Va. App. 529, 545 (2018); *see also* Rule 5A:30(b). Our "decisions regarding attorney's fees and costs are based on its consideration of factors including whether the requesting party prevailed, whether the appeal was frivolous, whether either party generated unnecessary expense or delay in pursuit of its interests, as well as 'all the equities of the

- 16 -

case.'" *Friedman*, 68 Va. App. at 546 (quoting Rule 5A:30(b)).  After considering the record and the equities of the case, we deny both parties' requests for attorney fees.

## III. CONCLUSION

For the foregoing reasons, we affirm the decision of the circuit court.

*Affirmed.*