## Richmond

FIRST NATIONAL BANK OF MARTINSVILLE AND
HENRY COUNTY, ADMINISTRATOR, ETC.
v. SIDNEY W. COBLER, ET AL.

April 28, 1975.

Record No. 740602.

Present, All the Justices.

*Ralph B. Rhodes; Bruce E. Welch (Hutcherson & Rhodes,* on brief), for appellant.

*Willard R. Finney (B. A. Davis, Jr.,* on brief), for appellees.

Compton, J., delivered the opinion of the court.

We consider in this appeal whether there has been a renunciation by surrender of a negotiable instrument, within the

meaning of the pertinent provisions of the Uniform Commercial Code.[1]

On July 16, 1966, to evidence an indebtedness created by a loan, the plaintiffs-appellees, Sidney W. Cobler and Carolyn D. Cobler, his wife, executed a promissory note payable to John Alva Cobler, Sidney's uncle, for $4,500, with interest. The note provided for installment payments of $41.63 monthly and was secured by a deed of trust on a parcel of land in Franklin County, Virginia.

Sidney and Carolyn made regular payments by check to Alva, according to the terms of the note, until Alva died intestate on March 15, 1971. Alva had retained possession of the note from the date it was made until some time during 1967, when he delivered the instrument to Sidney and his wife.

The defendant-appellant, First National Bank of Martinsville and Henry County, qualified on April 5, 1971, as administrator of Alva's estate. Thereafter Sidney and Carolyn ceased making payments under the note, contending that, when Alva delivered the note to them in 1967, he told them the note would be "cancelled" upon his death. In March of 1972, foreclosure proceedings were commenced and a trustee under the deed of trust advertised the property for sale. Thereupon, Sidney and Carolyn instituted the present proceeding by a bill in equity against the Bank and the trustee. The Coblers prayed for entry of an order temporarily enjoining the sale and asked the trial court to determine "the owner of the note."

The temporary injunction was granted and the trial court referred the cause to one of its commissioners in chancery who, after taking evidence *ore tenus*, reported that Sidney and

---

[1] We are concerned here with the following italicized language of Code § 8.3-605:

"**§ 8.3-605. Cancellation and renunciation.** — (1) *The holder of an instrument may even without consideration discharge any party*

(a) in any manner apparent on the face of the instrument or the indorsement, as by intentionally cancelling the instrument or the party's signature by destruction or mutilation, or by striking out the party's signature; or

(b) *by renouncing his rights* by a writing signed and delivered or *by surrender of the instrument to the party to be discharged.*

(2) Neither cancellation nor renunciation without surrender of the instrument affects the title thereto."

Carolyn had not been discharged from their obligation under the instrument. He found that the Bank, as administrator of Alva's estate, was entitled to recover the balance due on the note.

The chancellor then sustained the exceptions of Sidney and Carolyn to the commissioner's report after considering the depositions taken before the commissioner, the report, and the argument of counsel. The decree appealed from declared the note "null, void and of no effect, the Court having determined from the evidence that the payee of the note, John Alva Cobler, renounced his rights by surrendering the instrument to the parties to be discharged as contemplated by Sec. 8.3-605 of the Code of Virginia." We affirm.

■ Our standard of review under these circumstances should be kept clearly in mind, as the facts are considered. The Bank asserts, incorrectly, that we must sustain the commissioner's report "unless it plainly appears that it is contrary to the law and the evidence." A different rule of decision applies here. The chancellor has disapproved the report of the commissioner in chancery, therefore, we must review the evidence and ascertain whether, under a correct application of the law, the evidence supports the findings of the commissioner or the conclusions of the trial court. *Leckie* v. *Lynchburg Trust, etc., Bank,* 191 Va. 360, 364-65, 60 S.E.2d 923, 925 (1950); *Parkes* v. *Gunter & Byrd,* 168 Va. 94, 98, 190 S.E. 159, 160 (1937). *See Hoffecker* v. *Hoffecker,* 200 Va. 119, 125, 104 S.E.2d 771, 775 (1958).

The evidence adduced in behalf of the Coblers showed that Alva, who had never married, who was not an experienced businessman, and who "moved from place to place," held a great affection for Sidney. Sidney had borrowed funds from Alva prior to the transaction giving rise to this suit and had always repaid his uncle promptly. On this occasion, Sidney desired to purchase the property in question to establish his home there. Alva agreed to advance "the money." Thereafter, the note and deed of trust were executed. Alva retained physical possession of the note, apparently in his wallet, and kept the deed of trust in a "lock box" in the Bank.

During 1967, Alva went to Sidney's home and told Sidney and Carolyn, " 'I have got something I want to give you.' " According to Sidney, Alva "took out his pocketbook and said that this was just between us three and didn't nobody else except us need to know anything about it, and he gave me the note and said take

this and if anything happens to me this place will be yours and I want you to have it and he gave us the note and we kept it.... He said he knew we would pay him as long as he lived, and that he wanted us to have the place and that after he was gone it would be ours." Carolyn corroborated her husband's account of this discussion. She also testified that Alva "asked if we had a record of the payments that had already been made and at that time he had the note and I went and got the cancelled checks and he said he didn't have all the payments recorded and there were several checks that he didn't have down on the note . . . we had to get the cancelled checks out and get the dates for them.... he showed me how to put them on the back of the note and from that time on I kept it up to date and put all the payments on it.... he gave it to us and said he wanted us to pay him as long as he lived and after that the place was to be ours."

Six other witnesses called by the Coblers, who were related to Alva either by blood or by marriage, testified that at various times between 1967 and the day of his death in 1971, Alva told them that he "had it fixed" so that when he died, Sidney "would have the place." Abe Cobler, who was Alva's brother and Sidney's father, testified that about one year before he died, Alva stated that "he had things fixed so that Sid would not have anything to worry about."

The Bank's evidence was presented through seven witnesses, including two of Alva's brothers and two of his sisters. It showed that subsequent to the delivery of the note to Sidney, Alva had stated on several occasions that Sidney was to hold the note until it was paid and, further, that if he (Alva) died, Sidney was to continue making his payments to "the bank."

When the Bank qualified on Alva's estate, the deed of trust was found in one of its safe deposit boxes, rented by Alva. David I. Ramsey, Assistant Trust Officer for the Bank, testified that he "assumed" the note had been lost. Among Alva's effects were found two uncashed checks drawn to his order dated February 13 and March 4, 1971, in the amount of $41.63 each, signed by Carolyn and marked "House Payment."

As he began the process of administering the estate, Ramsey called on Sidney and Carolyn to make their monthly payments, under the note, to the Bank. During April, May and June of 1971, Sidney made no statement to Ramsey that he considered the note "cancelled." Harold J. Cobler, a brother of Alva and 82 years of

age, testified for the Bank about a conversation with Sidney, which took place about a month after Alva's death, when he (Harold) and Sidney's father, Abe, were leaving for Martinsville to talk to Ramsey concerning the estate. Harold stated that Sidney said "okay" when "I told him I was willing for him to continue his payments just like he had so that he could pay on the money that he owed Alva." Harold stated that Sidney did not then say "anything about the note being cancelled" upon Alva's death. Abe was not asked, nor did he testify, about this conversation.

During April and May, 1971, the Bank continued to exert pressure upon Sidney to resume the monthly payments. Sidney attempted to see his attorney but was unsuccessful. Finally, on May 13, 1971, after Ramsey called and told Sidney "he would sell [him] out," Carolyn sent the Bank a check for $83.26 to cover the payments for April and May.

Thereafter, Sidney saw his attorney, who notified the Bank in July of 1971 that, in his opinion, the Coblers were not legally obligated on the note because it had been returned to them by Alva with the understanding that it was to be considered "paid" upon his death. This litigation followed.

The sole issue is whether there was a renunciation by John Alva Cobler of his rights in the note by its surrender to Sidney and Carolyn Cobler, thereby discharging them, within the meaning of Code § 8.3-605 (1) (b).

The Bank argues, and the commissioner found, that the evidence failed to support a finding that Alva surrendered the note so as to constitute a renunciation of his rights. It argues, first, that the purpose of the redelivery was for "convenience of bookkeeping." The payments were listed on the note from August 11, 1966, through January 15, 1971. The evidence shows that Alva recorded the first seven payments and that Carolyn listed the rest. The commissioner reported that Alva "had not and was not keeping up with the credits that should have been made on the note in question" and that, because of Alva's trust in Sidney and Carolyn, he wanted them to record the payments on the note in order to receive proper credit therefor.

The Bank's second contention is that since the Coblers were to continue making payments on the obligation after redelivery, a surrender of the instrument was not accomplished.

The Bank apparently takes the position that for a renunciation by surrender to occur under the statute, it must become operative immediately upon transfer of possession and may not be made effective at a future date. We do not agree with either of the Bank's contentions.

The statutory language of Code § 8.3-605 (1) (b) is clear. It provides for discharge of a "party," the maker of a note. Code § 8.1-201 (29). This may be accomplished without consideration by the "holder," the payee of a note. *Id*. (20). Such discharge is accomplished by the holder's renunciation of his rights. This is done by "surrender" of the instrument to the maker.

In this context, the word "renounce" has a fixed meaning. Under one of the predecessor statutes to Code § 8.3-605, we stated that "renounce" means to announce one's abandonment of the ownership of, to abandon something possessed, as to renounce a title or a claim. *Farmer* v. *Farmer*, 195 Va. 92, 97, 77 S.E.2d 415, 418 (1953), construing Code of 1950, § 6-475.[2] The statute does not define "surrender" so we assign it the ordinary meaning. To "surrender" is "to relinquish . . . ; to deliver . . . into lawful custody; . . . to give up completely . . . in favor of another." Webster's Third New International Dictionary 2301. Has there been a "surrender" here? That is the crux of this case.

We hold the evidence fully supports the conclusion of the trial court that Alva Cobler surrendered this instrument, within the meaning of Code § 8.3-605.

We reject the Bank's contention that the purpose of redelivery of the note was for convenience of bookkeeping. It is true that prior to redelivery, Alva had failed to record several payments on the note. This fact alone does not require a conclusion that he desired to turn over the bookkeeping duties to the makers, as the commissioner found, nor does it alone support a finding that Alva, because of advanced age, was unable to accurately record the credits, as the Bank argues. Moreover, no witness testified

---

[2] " **§ 6-475. Renunciation by holder.** — The holder may expressly renounce his rights against any party to the instrument before, at, or after its maturity. An absolute and unconditional renunciation of his rights against the principal debtor made at or after the maturity of the instrument discharges the instrument. But a renunciation does not affect the rights of a holder in due course without notice. A renunciation must be in writing *unless the instrument is delivered up to the person primarily liable thereon.*" (Emphasis supplied.)

that Alva indicated, before or after redelivery, that the purpose of the transfer had anything to do with bookkeeping. Instead, there was positive and uncontradicted testimony by the makers, corroborated by other witnesses, that Alva's intention upon redelivery was to relinquish the note and to abandon the ownership thereof, to be effective upon his death. The trial court obviously accorded slight weight to the testimony of the Bank's witnesses who quoted Alva as saying that Sidney should pay "the bank" after Alva's death. Such testimony may properly be given little credit, since the Bank did not enter the picture until after Alva died intestate.

The Bank places great reliance on Sidney's conduct in 1971, after Alva's death, to establish the purpose of the redelivery, which occurred in 1967. It argues that during the three month period following the death, Sidney failed to deny liability on the note, admitted liability on the occasion when his father and uncle told him they were going to Martinsville to discuss the estate with the personal representative, and admitted the obligation by making the April and May payments on May 13, 1971. This conduct is readily explained in the evidence. During this period, Sidney was uncertain of his legal position. He had tried unsuccessfully to reach his lawyer. While he never denied the obligation, neither did he admit liability. To answer "okay" when Harold made known his personal wishes in Sidney's presence does not constitute a binding concession of responsibility. The April and May payments were made only after Ramsey threatened to foreclose on the Coblers' home. Payment under such circumstances is not such an admission of liability as should prevail over positive, corroborated evidence to the contrary.

■ Finally, there is no merit in the Bank's contention that a renunciation must be operative upon redelivery. It is settled that a renunciation may be made effective at a future date. *Farmer* v. *Farmer, supra*, 195 Va. at 97, 99, 77 S.E.2d at 417-18.

We hold, therefore, that the evidence supports the conclusions of the chancellor and, for these reasons, the decree of the trial court is

*Affirmed.*