## Richmond

DONALD L. SWEENEY, ET AL.

V.

FIRST VIRGINIA BANK OF TIDEWATER

January 21, 1983.

Record No. 800966.

Present: Carrico, C.J., Cochran, Poff, Compton, and Thompson, JJ., and Harrison, Retired Justice.

*Girard C. Larkin, Jr. (Stanley E. Sacks; Sacks, Sacks, and Larkin,* on brief), for appellants.
*Edward L. Breeden, III (S. Lawrence Dumville; Breeden, Howard & MacMillan,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

The trial court entered a final order awarding judgment against Donald L. Sweeney and Shirley L. Sweeney, in favor of First Virginia Bank of Tidewater in the amount of $137,796.98, with interest, on an indemnity bond in the principal sum of $142,000, executed on December 21, 1972, by the Sweeneys. The bond secured Citizens Bank of Poquoson (the Bank), predecessor to First Virginia Bank of Tidewater, against any losses incurred by the Bank in transactions with Batts & Hockaday Motors, Inc. (Batts & Hockaday). We granted the Sweeneys an appeal limited to two questions, whether the court erred in ruling (1) that the Bank's delivery of the bond to the Sweeneys and their attorney did not constitute a renunciation of the bond and discharge of the Sweeneys' obligation, and (2) that the Sweeneys' obligation under the bond was not conditioned upon Batts & Hockaday being held legally liable to the Bank.

Batts & Hockaday was a used car dealership. Donald Sweeney, the controlling stockholder, was president of the corporation; Shirley Sweeney was secretary. On December 21, 1972, the Bank held a note of Donald Sweeney payable December 27 in the amount of $36,000 and a note of Batts & Hockaday, endorsed by Donald Sweeney and N. G. Whitehead, Jr., payable December 18 in the sum of $42,500. Batts & Hockaday was also indebted to the Bank on overdrafts, originally in the aggregate amount of over $70,000,

but ultimately reduced to $59,296.98. Thereupon, to replace these obligations, the Sweeneys delivered to the Bank their demand note for $67,000, the demand note of Batts & Hockaday for $75,000, endorsed by the Sweeneys and Whitehead, and the Sweeneys' indemnity bond for $142,000, all dated December 21, 1972.

A dispute arose between the Bank and Sweeney over the refusal by Sweeney to give as additional security certain liens claimed by the Bank upon automobiles owned by Batts & Hockaday. The Bank instituted a chancery suit in January of 1973 against the Sweeneys, Batts & Hockaday, and Whitehead, seeking a court order directing Sweeney on behalf of Batts & Hockaday to assign the titles to certain vehicles to the Bank and appointing a receiver for Batts & Hockaday. The bill of complaint alleged that Sweeney on behalf of Batts & Hockaday had delivered physical possession of the titles to the Bank but had refused to assign them.

In a hearing held on January 11, 1973, the evidence showed that the Bank had not put the notes for $75,000 and $67,000 on the books of the Bank to replace the past-due obligations. The chancellor, ruling that the Bank was not holding the vehicle titles with "clean hands" because it did not "carry out [its] part of the transaction" and the intended novation was not completed, denied the relief which the Bank sought. The Bank did not appeal this ruling. On January 15, 1973, the Bank's attorney returned the notes for $75,000 and $67,000 and the bond for $142,000 to the Sweeneys' attorney.

Thereafter, the Bank filed motions for judgment on the $36,000 note, the $42,500 note, and the Batts & Hockaday $59,296.98 overdraft. These actions were tried on June 12, 1973, with the same trial judge presiding who had been the chancellor in the chancery cause. At the conclusion of the evidence, the trial court granted the defendants' motion to strike the plaintiff's evidence in each action, ruling that the notes for $75,000 and $67,000 and the bond for $142,000 represented a novation and replaced the $36,000 note, the $42,500 note, and the $59,296.98 overdraft. The Bank sought to appeal this ruling in each action, but we refused the petitions. 214 Va. liv (1974).

In 1977, the Bank filed its motion for judgment to collect the $75,000 note which had been returned to the Sweeneys' attorney in 1973. In 1978, the Bank filed its motion for judgment on the $142,000 indemnity bond of the Sweeneys which also had been returned to their attorney. The actions were tried together. At the

conclusion of the plaintiff's evidence, the trial court (a different judge presiding from the one who had presided in the earlier court proceedings) struck the evidence as to the $75,000 note on the ground that under the evidence the delivery of the note to the Sweeneys' counsel in 1973 discharged the obligation pursuant to the provisions of Code § 8.3-605.[1] The court overruled the motion to strike the Bank's evidence as to the $142,000 indemnity bond and at the conclusion of all the evidence made certain findings of fact and awarded judgment in favor of the Bank in the amount of the unpaid indebtedness owed to the Bank by Batts & Hockaday. There was ample evidence to support the court's finding that the Bank sustained losses aggregating $137,796.98 in its transactions with Batts & Hockaday, and we will not disturb this finding. We will explore the evidence further, however, to determine whether it supports the court's finding that delivery of the bond to the Sweeneys' attorney was "not intended by the parties as a discharge of the obligation of the defendants [the Sweeneys] thereon."

One of the Bank's attorneys in the chancery cause, James E. Bradberry, testified in the present case that the notes and bond were returned because the chancellor directed that this be done. According to Bradberry, at the conclusion of the hearing in the chancery cause on January 11, 1973, the chancellor gave these directions to him in chambers in an *ex parte* discussion. Although the Bank "felt that there was still outstanding indebtedness," the chancellor had ruled that there had been no novation and had informed the Bank's trial attorneys that in his opinion the Bank did not have the right "to hold two sets of notes." No transcript was made of this discussion in the chancellor's chambers, and no decree incorporating the chancellor's oral instructions was entered. Nevertheless, after conferring with other counsel for the Bank, the Bank's trial attorneys unconditionally delivered the notes and bond, which were not cancelled, marked "paid," or defaced, to the Sweeneys' attorney, F. Lee Cogdill. Bradberry testified that if he and other counsel for the Bank had intended that the notes have

---

[1] Code § 8.3-605 provided:

(1) The holder of an instrument may even without consideration discharge any party

\* \* \*

(b) by renouncing his rights by a writing signed and delivered or by surrender of the instrument to the party to be discharged.

no legal effect they would have defaced or destroyed the notes before returning them. The letter of transmittal evidencing the return of all three documents, however, contained no conditions, reservations, or explanation. There was evidence that upon receiving the notes and bond the Sweeneys' attorney delivered them to Donald Sweeney, who promptly destroyed them.

The Sweeneys contend that execution of the notes and bond was a single transaction, because the bond was executed for the sole purpose of securing payment to the Bank of the $75,000 and $67,000 notes. When the Bank elected, for whatever reason, to deliver the notes and the bond, the Sweeneys argue, it relinquished any claim or right to all of them, as evidenced by the Bank's subsequent effort to proceed on the older notes for $36,000 and $42,500, and on the overdraft for $59,296.98. Counsel for the Sweeneys conceded in oral argument that if the bond is held to have been discharged, the result will be that the Sweeneys as debtors will receive the benefit of a "free ride" at the Bank's expense. This result could have been avoided, he argued, if the Bank had resorted to some other available remedy after the trial court ruled in June of 1973 that there had been a novation.

These arguments raise three issues — the significance that should be given to 1) destruction of the original bond, 2) the Bank's delivery of the bond to the Sweeneys, and 3) the presence or absence of consideration for the delivery of the bond. Addressing the first issue, we note that under the law as it existed before enactment of the Uniform Commercial Code, the presumption was that destruction by the holder of a negotiable instrument was done intentionally to cancel the instrument. The burden of proof was on the party alleging that the apparent cancellation was made unintentionally or under mistake, or without authority. *Jones' Adm'rs* v. *Coleman,* 121 Va. 86, 88-89, 92 S.E. 910, 911 (1917). As the Uniform Commercial Code is silent on the burden of proof, preexisting law governs and the burden presumably remains on the person suing on a negotiable instrument to rebut the presumption arising from the destruction of the original. *See* Code § 8.3-605, Virginia Comment; *see also* Code § 8.1-103.

Whether a similar presumption arises in the case of a nonnegotiable instrument is immaterial in this case. The Bank, suing on the bond, had the burden of establishing the Sweeneys' liability on the bond. The Bank, therefore, had the burden of explaining its failure to produce the original instrument. The record shows that

the bond was not destroyed by Bank officials or by anyone acting upon their directions. Thus, in determining whether the Bank had carried the burden of proof, the trial court was not required to attach conclusive significance to the fact that the original bond had been destroyed.

■ Second, the delivery of the bond to the obligors under the circumstances of this case did not compel a finding that the obligation had been discharged. Under the Uniform Commercial Code, the holder of a negotiable instrument "may" discharge the obligor by "surrender" to him of the instrument. *See* Code § 8.3-605(1)(b). The term "surrender" connotes "an intention upon redelivery . . . to relinquish the note and abandon the ownership thereof." *Martinsville Bank* v. *Cobler,* 215 Va. 852, 857-58, 213 S.E.2d 800, 803-04 (1975). That mere delivery does not by itself result in discharge is evident from the extensive analysis of the attending circumstances in *Cobler* and the fact that the discharge given effect in that case occurred, as the obligee intended, not at the time of delivery but four years thereafter. *Id.* at 854-58, 213 S.E.2d at 802-04. *See also Miller* v. *Gayman,* 482 S.W.2d 414 (Mo. 1972); *see generally* J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 13-19 (2d ed. 1980).

Since this bond is nonnegotiable, the Uniform Commercial Code does not govern this case. However, we hold that redelivery of a nonnegotiable bond to the obligors does not discharge the bond if the evidence establishes that there was no intention by the obligee[2] to discharge. This Court held long ago that mere possession of a nonnegotiable document should not be given dispositive significance. *Brown* v. *Taylor,* 73 Va. (32 Gratt.) 135 (1879). We do not need to assess the merits of the decision in *Brown* to agree with its conclusion that the effect to be given to the transfer of a bond depends on the intention of the parties.[3] *See generally* J.

[2] Neither *Cobler* nor this case addresses controversies involving a holder in due course of a *bona fide* purchaser for value without notice.

[3] Although neither party cites *Parkes* v. *Gunter & Byrd,* 168 Va. 94, 190 S.E. 159 (1937), that case by implication supports our conclusion that there must be an intention to discharge a nonnegotiable bond. In *Parkes* we held that a release had occurred even though the holder, who had purchased the bond, contended that the bond was marked "paid" and released in the clerk's office without his authority. We held that the bond was released, not because the intention of the person entitled to payment was not significant, but rather because the evidence established that the bond had been released with his knowledge and consent. *Id.* at 102, 190 S.E at 162.

Calamari & J. Perillo, The Law of Contracts § 21-3, at 760-61 (2d ed. 1977) (surrender of an instrument under seal results in discharge if the party having the right intends to discharge the duty).

In this case the trial court found that the "delivery of the bond [by the Bank] to counsel for the defendants . . . was not intended by the parties as a discharge of the obligation of the defendants thereon." This finding must stand if it is supported by credible evidence.

Reviewing the record, we note that the attorney for the Bank, Bradberry, testified that the new notes and the bond were delivered to counsel for the Sweeneys because "[w]e were directed to return them" by the trial judge. The conference with the trial judge which led to this decision was *ex parte* and no record of it exists. The Sweeneys, however, gave no testimony inconsistent with the Bank's explanation of the delivery. Bradberry testified that the disposition of the instruments after delivery was never discussed and there was no understanding that they would be destroyed. Cogdill said it was understood that the returned instruments would be destroyed. Both Cogdill and Sweeney admitted, however, they were not destroyed during the meeting with Bradberry. Rather, they stated that Sweeney destroyed the bond and notes after the meeting as they returned in Cogdill's car to Cogdill's office. Finally, we note that a letter from Bradberry given to Cogdill at the time of the transaction described the various documents, including the bond, as "delivered" to Cogdill and his clients. The trial court may have found the use between lawyers of the word "delivered" rather than "surrendered" significant in searching for the intention which accompanied this transaction. In summary, we cannot say that the trial court's finding — that the delivery of the bond was not intended as a discharge — was not supported by credible evidence.

Third, we deem it significant that there is no evidence of any consideration for the discharge which the Sweeneys allege occurred. The complete absence of such evidence further supports the trial court's conclusion that there was no intention to discharge the obligation which the bond represented. Moreover, we note that some courts have held that lack of consideration for a release of a bond may, by itself, defeat the argument that the bond was released. *See Stoer* v. *Holtz,* 104 Pa. Super. 579, 158 A. 611 (1932).

The Sweeneys further argue that by the plain terms of the bond their obligation was conditional upon Batts & Hockaday being held legally liable to the Bank. They rely upon the following language in the preamble to the bond:

> [T]he said Donald L. Sweeney and Shirley L. Sweeney have agreed to execute the Bond in order to secure said Bank of any amounts for which Batts & Hockaday Motors, Inc., is or may hereafter be legally liable.

The Sweeneys say that the establishment of legal liabilty to the Bank on the part of Batts & Hockaday was a condition precedent to enforcement of the bond. Not only is there no evidence that such legal liability was determined, the Sweeneys maintain, but the record shows that the trial court had ruled in a previous case that neither the Sweeneys nor Batts & Hockaday were liable on the $36,000 and $42,500 notes and the overdraft. Furthermore, the trial court had ruled in the present case that the $75,000 note of the Sweeneys had been discharged by surrender, so there could be no liability fixed under that obligation.

We do not agree with the Sweeneys' interpretation of the terms of the bond. We view the operative provisions of the bond to be the following:

> [I]f the aforesaid obligators shall protect and save harmless said Bank from any loss . . . or losses occurring or that may occur to the Bank by reason of any transaction between said Batts & Hockaday Motors, Inc., and said . . . Bank . . . including the cashing of checks, discounting of notes, drafts, or granting of loans, or any other instrument whatsoever, then the above bond to be void, otherwise to remain in full force and effect . . . .

The bond also contained a clause providing that the bond may be "called for payment . . . upon default of any obligation" of the Sweeneys.

The bond recited that Batts & Hockaday desired to "negotiate loans and discount notes" at the Bank, and the Bank deemed it "advisable to acquire" the bond as "additional security." The language of the bond was broad enough to cover all the obligations then existing or thereafter incurred by Batts & Hockaday without requiring that the underlying obligations be reduced to judgment.

The trial court made the factual finding that the Bank had sustained losses of $137,796.98 in transactions with Batts & Hockaday. This finding, which is supported by the evidence, is sufficient to establish liability under the bond.

For the foregoing reasons, we will affirm the judgment of the trial court.

*Affirmed.*

CARRICO, C.J. and COMPTON, J., dissent.