COURT OF APPEALS OF VIRGINIA


Present:  Judges Frank, Kelsey and Senior Judge Willis
Argued at Chesapeake, Virginia


CHARLES G. WATTS, JR.
                                          OPINION BY
v.    Record No. 2235-02-1      JUDGE JERE M.H. WILLIS, JR.
                                          MAY 27, 2003
LINDA E. WATTS


            FROM THE CIRCUIT COURT OF GLOUCESTER COUNTY
                    William H. Shaw, III, Judge

            Alexander S. de Witt (Ronald S. Evans;
            Brenner, Evans & Yoffy, P.C., on brief), for
            appellant.

            Breckenridge Ingles (Martin, Ingles & Ingles,
            Ltd., on brief), for appellee.


      Charles G. Watts, Jr. (husband) contends on appeal that the

trial court erred: (1) in finding that Linda Watts (wife) proved

his adultery by clear and convincing evidence; (2) in relying on

its finding of adultery in determining equitable distribution

under Code § 20-107.3(E); (3) in finding that husband's actions

outside the marriage constituted serious negative nonmonetary

contributions and in relying on that finding to justify an

unequal distribution of the marital estate; (4) in classifying

certain items of personal property acquired during the marriage

as wife's separate property; and (5) in allocating a

substantially disparate share of the marital estate to wife.  We

affirm in part, reverse in part, and remand.

## BACKGROUND

The parties were married on May 23, 1980. They have one child, born on May 2, 1988. On April 27, 2001, wife filed a bill of complaint seeking a divorce on the ground of adultery. On April 16, 2002, the trial court conducted an ore tenus hearing on the issues of adultery and equitable distribution. In an opinion letter dated June 27, 2002, the trial court found that wife "established her claim of Husband's adultery[,] . . . granted the divorce on those grounds" and "report[ed] [its] conclusions with respect to equitable distribution, having reviewed the pleadings, transcripts, exhibits and arguments." On July 29, 2002, the trial court entered the final decree of divorce setting forth those determinations.

## ADULTERY

Husband contends the evidence was insufficient to prove he committed adultery.

"'To establish a charge of adultery the evidence must be clear, positive and convincing. Strongly suspicious circumstances are insufficient. Care and circumspection should accompany consideration of the evidence.'" Romero v. Colbow, 27 Va. App. 88, 93-94, 497 S.E.2d 516, 519 (1998) (quoting Painter v. Painter, 215 Va. 418, 420, 211 S.E.2d 37, 38 (1975)). However, "'while a court's judgment cannot be based upon speculation, conjecture, surmise, or suspicion, adultery does

-

not have to be proven beyond a reasonable doubt.'"  Gamer v.

Gamer, 16 Va. App. 335, 339, 429 S.E.2d 618, 622 (1993)

(quoting Coe v. Coe, 225 Va. 616, 622, 303 S.E.2d 923, 927

(1983)).  Rather, the evidence must "'produce in the mind of the

trier of facts a firm belief or conviction as to the allegations

[of adultery] sought to be established.'"  Cutlip v. Cutlip, 8

Va. App. 618, 621, 383 S.E.2d 273, 275 (1989) (quoting Seemann

v. Seemann, 233 Va. App. 290, 293 n.1, 355 S.E.2d 884, 886 n.1

(1987)).  "It is well settled, however, that such proof may be

by circumstantial as well as direct evidence."  Bowen v.

Pernell, 190 Va. 389, 393, 57 S.E.2d 36, 38 (1950).

     "[I]n determining whether clear and convincing evidence

supports a finding of adultery, the Supreme Court and this Court

have consistently reviewed the record to determine not only

whether the evidence merely established suspicious conduct, but

also whether a credible explanation existed for the

circumstances."  Hughes v. Hughes, 33 Va. App. 141, 150, 531

S.E.2d 645, 649 (2000).

     The evidence was before the trial court on both depositions

and an ore tenus hearing.  While "a divorce decree based solely

on depositions is not as conclusive on appellate review as one

based upon evidence heard ore tenus," it is nonetheless

"presumed correct and will not be overturned if supported by

substantial, competent and credible evidence."  Collier v.

-

*Collier*, 2 Va. App. 125, 127, 341 S.E.2d 827, 828 (1986).  If the court "'hears the evidence ore tenus, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" *Pommerenke v. Pommerenke*, 7 Va. App. 241, 244, 372 S.E.2d 630, 631 (1988) (quoting Martin v. Pittsylvania County Dep't of Social Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)).  In both instances, however, we must, on appeal, "view [the] evidence and all reasonable inferences in the light most favorable to the prevailing party below."  Id.

Wife testified on deposition that, by early 2000, husband "came home from work late almost every night" and took a change of clothes with him.[1]  She noticed that he began checking his voice mail more frequently, and his telephone usage increased. In January, 2000, she overheard him on the telephone tell someone, "'I love you more than I've ever loved any woman in my life.  I miss you.  I have been enjoying all of our late nights together.'"  In March, 2000, husband left the marital home and

---

[1] Most of the evidence surrounding the charge of adultery is contained in the deposition transcripts, however, wife did testify at the ore tenus hearing that, within the past five years, husband "never came home before 10:30 [p.m.]" on weeknights.  She also testified that husband provided minimal if any assistance with household and familial chores and duties and that their son has suffered emotional problems as a result of their separation and divorce.

-

moved into an apartment.  In October, 2000, he contacted wife, told her he loved her, "that his relationship with Virginia [Mae Glass] had just been [an] infatuation, and that he wanted to come back home."  He returned home shortly thereafter and relations between the parties improved.

However, by January, 2001, the relationship worsened. Husband again began coming home late, and wife began noticing that husband's shirts had the smell of perfume.  She hired a private investigator.  She kept a record of husband's schedule in March, 2001 and documented several Fridays on which he did not return home until early morning.

On March 8, 2001, wife hired private investigator Dairold Easterwood to determine whether husband "was seeing someone else."  Easterwood conducted surveillance on six dates in March. On March 9, 2001, Easterwood followed husband from his place of employment (Printpak) to 126 Nelson Drive in Williamsburg. Husband arrived at 5:30 p.m., parked and met Virginia Mae Glass, who also worked at Printpak.  They "exchanged an embrace and a short kiss," entered husband's vehicle and left.  Around 6:30 p.m., they drove to a house located at 124 Norge Lane, entered and remained until 10:50 p.m.  They then returned to 126 Nelson Drive.  Glass exited husband's truck and entered her car. They drove individually from there to 7850 Cedar Springs Drive in Gloucester.  They arrived a little after midnight, parked,

-

got out and "exchange[d] a kiss and embraced."  Husband then re-entered his truck and left.

On the afternoon of March 14, 2001, husband left his office at 5:05 p.m., entered his car and drove away.  Five minutes later, Glass left the Printpak office.  Easterwood followed Glass "to a roadside parking area on the Colonial Parkway."  Glass parked near husband's waiting vehicle.  They exited their cars, embraced and left.  Unable to follow them, Easterwood proceeded to the 7850 Cedar Springs Drive address.  At 9:09 p.m. Glass and husband arrived in their respective vehicles.  They exited, embraced and entered the residence.  "[T]he porch light that was on was turned off."  At 9:45 p.m. another vehicle arrived, a "reddish 4-by-4," parked and the driver entered the residence.  At 9:55 p.m., husband left.

On March 15, 2001, Easterwood set up surveillance at 7850 Cedar Springs Drive at 8:30 p.m.  At 9:15 p.m., husband "drove up . . . followed by . . . Ms. Glass in her red Oldsmobile."  They parked and entered the residence.  At 9:40 p.m. "the same reddish 4-by-4 came and pulled into the drive."  "[B]etween 9:45 and 9:50, [husband] came out and got in his vehicle and left."

On March 16, 2001, Easterwood began surveillance at Printpak at 4:00 p.m.  At 5:20 p.m., husband and Glass left the building and entered their respective vehicles.  They drove to 126 Nelson Drive and parked.  They met on the sidewalk, embraced

-

and kissed.  Husband changed clothes, and the two drove in husband's vehicle to a restaurant and had dinner.  Around 7:06 p.m., they entered the house at 124 Norge Lane and remained inside until 10:25 p.m.  Husband and Glass then drove to a movie theater complex in Hampton.  They watched a movie, "embracing and kissing several times throughout the movie," and left around 12:45 a.m. when the movie ended.  After the movie, they went to the 7850 Cedar Springs Drive residence, arriving at 1:50 a.m.  At 2:20 a.m., Easterwood saw a light in a front room become "dim" or "very low" in brightness.  The lights in that room "brightened up at 4:15 [a.m.]," and at 4:30 a.m., husband got into his vehicle and left.

On March 23, 2001, Easterwood saw husband and Glass leave their office at 5:05 p.m., enter their respective vehicles and drive to 126 Nelson Drive.  They met on the sidewalk, embraced and kissed.  Husband changed his shirt and pants and got into the passenger seat of his truck.  Glass got into the driver's seat and drove from the scene.  Easterwood lost them in traffic, so he proceeded to the 7850 Cedar Springs Drive address and waited, without success, until 8:30 p.m., at which time he terminated surveillance.

On March 30, 2001, Easterwood went to Printpak at 3:45 p.m.  At 5:13 p.m., Glass left Printpak and drove to a bank parking lot where she parked and joined husband, who was in his pickup

-

truck.  At 6:45 p.m., they entered the 124 Norge Lane residence.

They stayed there until 10:55 p.m., when they recovered Glass's

car and drove their respective vehicles to the 7850 Cedar

Springs Drive residence, arriving around 12:15 a.m.  At

12:40 a.m., the light in the front room dimmed, and at

4:20 a.m., the light brightened and husband entered his truck

and departed.

In April, 2001, wife told husband she intended to file for

divorce on the ground of adultery.

Virginia Mae Glass testified in deposition that she resides

at 126 Nelson Drive in Williamsburg and has worked at Printpak

and known husband since 1997.  She said husband has visited her

in her home.  When asked whether she and husband had a sexual

relationship, she invoked the Fifth Amendment.  To subsequent

questions directed at a possible relationship, she stated "I

don't remember" or "I plead the Fifth."

In deposition testimony, husband suggested there were times

he and Glass "had to be together" for "certain

[business-related] functions."  When asked whether he visited

Glass's home between January 1, 2001 and April 1, 2001, he

replied, "I don't remember."  When asked whether he had sexual

intercourse with Glass, he invoked the Fifth Amendment.

This case is controlled by Coe, 225 Va. 616, 303 S.E.2d

923.  The facts in Coe are similar to those in this case.  After

-

discovering that Mrs. Coe was seeing another man (Madden), Mr. Coe hired a private investigator to conduct surveillance.  Id. at 620-21, 303 S.E.2d at 926.  The investigator saw Mrs. Coe's car parked outside Madden's apartment at 3:16 a.m.  Id. at 621, 303 S.E.2d at 926.  The lights of the apartment were out.  Id. At 7:13 a.m., Madden left the apartment.  Id.  Mrs. Coe left the apartment almost an hour later.  Id.  After Mrs. Coe departed, the investigator knocked on Madden's door and telephoned, but no one answered.  Id.  The same scenario took place the next night. Id. at 621-22, 303 S.E.2d at 927.  Mrs. Coe's car was parked outside Madden's darkened apartment at 2:58 a.m.  Id. at 622, 303 S.E.2d at 927.  Madden left at 7:15 a.m., and Mrs. Coe left at      7:53 a.m.  Id.

In affirming the trial court's finding of adultery based upon testimony from Mr. Coe and the investigator, the Supreme Court explained:

> Although the allegation of adultery was denied by [Mrs. Coe in the bill of complaint], the record contains no testimony by her, or that of any witness, which contradicts or denies the testimony given by [Mr. Coe] and the detective as to the alleged adultery.  [Mrs. Coe] ma[d]e no attempt to explain her relationship with Madden, or her presence in his unlighted apartment on the two occasions testified to by the detective.

Id. at 622, 303 S.E.2d at 927.

-

The Supreme Court distinguished Dooley v. Dooley, 222 Va. 240, 278 S.E.2d 865 (1981), in which the trial court disregarded the commissioner in chancery's recommendation not to find Mrs. Dooley guilty of adultery. The Coe Court emphasized that Mrs. Dooley had testified before the commissioner, who "heard all the evidence in the case," rather than the trial judge, and had provided the commissioner an "explanation of the events which had been narrated by the [private] detective." Coe, 225 Va. at 622, 303 S.E.2d at 927. The evidence before the commissioner supported his determination that adultery was not sufficiently proven and demonstrated that the trial court erred when it disregarded that finding. Id.

The majority of the cases cited by husband in support of reversing the trial court are distinguishable in that many of those cases involved trial court findings of insufficient evidence of adultery, affirmed on appeal. See, e.g., Seemann, 233 Va. 290, 355 S.E.2d 884 (commissioner and trial judge found no adultery; affirmed on appeal); Painter, 215 Va. at 420, 211 S.E.2d at 38 (trial court found no adultery; Supreme Court affirmed, holding trial court not plainly wrong in finding evidence insufficient); Haskins v. Haskins, 188 Va. 525, 50 S.E.2d 437 (1948) (trial court found that wife's allegation of adultery was not proved; affirmed on appeal). In those cases, as here, on appellate review a trial "'[court's] finding is

-

entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Pommerenke, 7 Va. App. at 244, 372 S.E.2d at 631 (quoting Martin, 3 Va. App. at 20, 348 S.E.2d at 16).

Hughes, upon which husband relies, is also distinguishable. There, the trial court found Mrs. Hughes guilty of adultery based on her cohabitation with alleged paramour, Kopeski. Hughes, 33 Va. App. at 145, 531 S.E.2d at 647. Mrs. Hughes testified that she and her children initially lived with relatives after she left the marital residence due to husband's physical abuse. Id. at 144, 531 S.E.2d at 646. Due to space limitations, she and the children left the relatives' home and moved into a shelter. Id. Five months later, she and the children "moved into Kopeski's residence . . . because she had 'nowhere else to live.'" Id. at 144-45, 531 S.E.2d at 646. Both Mrs. Hughes and Kopeski testified in depositions "that they maintain[ed] separate bedrooms" and "[were] not having sexual intercourse." Id. at 145, 531 S.E.2d at 646. In reversing the trial court's finding of adultery, we distinguished "[t]hose cases [which] involved covert meetings" between a spouse and a suspected paramour for which "no reasonable explanation for the spouse's conduct" existed. Id. at 150, 531 S.E.2d at 649. We also recognized situations where there is evidence "'that the relationship or living arrangement between the [spouse] and the

-

[alleged paramour] was for economic benefit or personal convenience or was other than amorous.'" Id. at 152, 531 S.E.2d at 650 (quoting Gamer, 16 Va. App. at 340, 429 S.E.2d at 622). Hughes involved a situation very different from this case. Here, husband acted covertly and provided no plausible explanation for his clandestine meetings with Glass.

Wife proved by clear and convincing evidence that husband committed adultery. In January 2000, two months before husband first left the marital home, wife overheard husband tell someone over the telephone how much he missed and loved the unidentified person on the other end. In October 2000, after returning to the marital home from a previous separation, husband admitted to wife he had an "infatuation" with Glass.

Glass admitted socializing with husband before he and wife separated, and she provided no explanation for the after-work liaisons documented by Easterwood.

Surveillance revealed a series of meetings between husband and Glass taking place after work in March 2001, at which husband and Glass were embracing and kissing in public. On two occasions husband and Glass spent several hours inside 124 Norge Lane. On March 16, 2001, after spending three and one-half hours inside the Norge Lane residence, husband and Glass went to a late movie, then to the house on Cedar Springs Drive, where husband remained until 4:30 a.m. On March 30, husband and Glass

-

spent over four hours at the Norge Lane home, after which they went to the Cedar Springs Drive home, where husband remained with Glass for three and one-half hours, leaving at 4:20 a.m.

Husband denied recalling the March 2001 visits. He provided no explanation for his presence with Glass until the late hours of the night.[2] Because the record supports the trial court's determination that wife established her claim of adultery, we affirm that holding.

## RELIANCE ON ADULTERY

Husband contends the trial court erred in relying upon its finding of adultery in determining equitable distribution. This argument was dependent on a determination by us that wife failed to prove adultery by clear and convincing evidence. Because we find sufficient evidence supported the trial court's finding of adultery, see supra, we also hold that the trial court did not err in considering adultery in regard to equitable distribution. See Code § 20-107.3(E)(5) (the trial court may consider circumstances and factors which contributed to the dissolution

_____

[2] Although husband invoked the Fifth Amendment when asked during deposition testimony whether he and Glass engaged in intercourse, we make no negative inference based on his exercise of the privilege. See Code § 8.01-223.1; see also Romero, 27 Va. App. at 93, 497 S.E.2d at 518 (fact that wife exercised her Fifth Amendment rights could not be used against her by commissioner). In doing so, however, husband failed to provide a reasonable explanation for his conduct, a matter about which we do take cognizance.

-

of the marriage, specifically including any ground for divorce, in fashioning an award).

## NEGATIVE, NONMONETARY CONTRIBUTIONS

Husband asserts the trial court "err[ed] in finding that his 'actions outside the marriage constituted serious negative, non-monetary contributions,' and in relying upon this finding as an equitable distribution factor justifying an unequal distribution of the marital share." We disagree.

Resolution of this issue is controlled by Code § 20-107.3(E) and our holdings in Smith v. Smith, 18 Va. App. 427, 431, 444 S.E.2d 269, 273 (1994), and O'Loughlin v. O'Loughlin, 20 Va. App. 522, 458 S.E.2d 323 (1995).

Code § 20-107.3(E) provides, inter alia, that the division of marital property shall be determined by the court after considering nine specified factors plus "[s]uch other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable monetary award." Code § 20-107.3(E)(10). Subsection (E)(1) allows the trial court to consider "[t]he contributions, monetary and nonmonetary, of each party to the well-being of the family," and subsection (E)(5) allows consideration of "[t]he circumstances and factors which contributed to the dissolution of the marriage, specifically including any ground for divorce."

-

In Smith, we affirmed the trial court's determination that husband did not dissipate assets.  In approving an alternative way to address the use of marital funds to pursue a paramour, we explained that, in addition to considering the effect of fault on the value of the marital estate pursuant to subsection (E)(5), a trial "court may also consider the negative impact of the affair on the well-being of the family [pursuant to] Code § 20-107.3(E)(1), and the mental condition of the parties [pursuant to] Code § 20-107.3(E)(4)."  Smith, 18 Va. App. at 431, 444 S.E.2d at 273.

In O'Loughlin, Mr. O'Loughlin argued that the "trial court's equitable distribution award was based entirely and wrongfully upon consideration of his negative nonmonetary contributions to the well-being of the family, absent economic fault on his part."  O'Loughlin, 20 Va. App. at 524, 458 S.E.2d at 324.  In upholding the trial court's ruling, we explained, "as long as the trial court considers all the factors, it is at the court's discretion to determine what weight to give each factor when making the equitable distribution award."  Id. at 526, 458 S.E.2d at 325 (holding that trial court is not required to "quantify the weight given to each" factor or to weigh each factor equally).  "Not only did [Mr. O'Loughlin] make no positive nonmonetary contributions, his unfaithfulness hindered the wife's efforts to contribute to the partnership in a

-

nonmonetary way." Id. at 527, 458 S.E.2d at 326 (explaining that if evidence of misconduct is relevant under any factor other than subparagraph (5), "it may in the judge's discretion be considered"). Moreover, "[j]ust as marital fault could be shown to have an economic impact on a marriage, i.e., waste or dissipation of assets, it can also be shown to have detracted from the marital partnership in other ways." Id. at 528, 458 S.E.2d at 326.

Part of husband's argument on this issue is that "the evidence in this case failed to establish marital fault on his part that . . . affected the marital estate or well being of the family, within the meaning of O'Loughlin." He also argued that "the trial court failed to identify or explain how Husband's nonmonetary 'actions outside the marriage' resulted in an adverse economic impact on the well-being of the family."

Consideration of nonmonetary contributions to the well being of the family under Code § 20-107.3(E)(1) requires no showing of an adverse economic impact. In that context, the "well-being" of the family relates to the effect on the family's emotional welfare and condition.[3] During the ore tenus hearing,

---

[3] In Aster v. Gross, 7 Va. App. 1, 371 S.E.2d 833 (1988), we said:

> [C]ircumstances that affect the
> partnership's economic condition are factors
> that must be considered for purposes of

-

> . . . equitable distribution. . . .
> Circumstances that lead to the dissolution
> of the marriage but have no effect upon
> marital property, its value, or otherwise
> are not relevant to determining a monetary
> award, need not be considered.

Id. at 5-6, 371 S.E.2d at 836.  In O'Loughlin we explained
Aster, saying:

> The rule established in Aster, that
> circumstances leading to the dissolution of
> the marriage but having no effect on the
> marital property or its value are not
> relevant to determining the monetary award,
> was meant to require proof of some
> relationship between the fault and the
> marital estate, to require objectivity to
> the trial court's decision making on
> equitable distribution, and was focused on a
> couple's monetary contributions.  Our
> purpose was to eliminate arbitrary monetary
> awards that punished a spouse for his or her
> fault without showing such fault had an
> economic impact on the marriage.  However,
> our ruling in Aster did not establish that
> the negative impact of marital fault or
> other behavior could not be considered in
> light of the other factors, under Code
> § 20-107.3(E).  Just as marital fault could
> be shown to have an economic impact on a
> marriage, i.e., waste or dissipation of
> assets, it can also be shown to have
> detracted from the marital partnership in
> other ways.  Thus, as in this case, the
> trial court found not only that appellant
> made no nonmonetary contributions to the
> well-being of the family, but that his
> long-term infidelity and abusive behavior
> over the course of the marriage actually had
> a negative impact on the marital
> partnership.

O'Loughlin, 20 Va. App. at 528, 458 S.E.2d at 326.

-

wife testified that, during "the last five years," husband "was never home." "[O]n weeknights he never came home before 10:30 [p.m.]" The trial court admitted without objection wife's Exhibit 14, entitled "Non-Monetary Contributions." In it, wife listed the respective percentage of time she and husband spent doing family-related tasks and duties. She indicated she was responsible for between 90% and 100% of every activity except for "Vacation/Move Planner," for which she and husband each contributed 50% of the time required. Some of the other activities for which wife claimed she expended most of the effort included buying and preparing food, cleaning, gardening, doing yard work, caring for the pet, bookkeeping and budgeting, gift giving, child care and overseeing their son's health, education and welfare.

The record supports the trial court's finding that husband's actions constituted "negative non-monetary contributions," and its consideration of that factor in distributing the marital property. The testimony of wife and Easterbrook proved a course of conduct by husband of meeting with Glass after work and staying out late. Such actions prejudiced the well-being of the family and dashed any hope that the parties' October, 2000 reconciliation would succeed. During the last five years of the marriage, nearly one-fourth of the time the parties were married, husband came home late and failed

to help with family responsibilities.  His late-night activities foreclosed contact with his school-age son and required wife to assume most family responsibilities and duties.  Wife testified that since the separation and divorce proceedings, the parties' minor son "has had a lot of emotional problems" and is currently undergoing counseling.

Husband objects to the trial court's characterization of his negative nonmonetary contributions as "serious."  It lies within the trial "court's discretion to determine what weight to give each factor when making the equitable distribution award." O'Loughlin, 20 Va. App. at 526, 458 S.E.2d at 325.  Evidence supported the trial court's recognition and consideration of husband's negative nonmonetary contributions, and we find no abuse of discretion in its labeling them serious.

CLASSIFICATION OF PROPERTY AS SEPARATE

Husband contends the trial court erred in classifying certain items of personal property as wife's separate property. We agree.

> Separate property is:  (i) all property, real and personal, acquired by either party before the marriage; (ii) all property acquired during the marriage by bequest, devise, descent, survivorship or gift from a source other than the other party; (iii) all property acquired during the marriage in exchange for or from the proceeds of sale of separate property, provided that such property acquired during the marriage is maintained as separate property; and (iv)

-

            that part of any property classified as
            separate pursuant to subdivision A 3.

Code § 20-107.3(A)(1).

     Subdivision (A)(3) includes provisions allowing the court

to find that separate property exists, even when marital and

separate property are "commingled" in some manner, "to the

extent the contributed property is retraceable by a

preponderance of the evidence and was not a gift."  See, e.g.,

Code § 20-107.3(A)(3)(d),(e) and (f).

     Code § 20-107.3(A)(3)(d) provides, in pertinent part, that

where separate property is contributed to marital property, "to

the extent that the [separate] property is retraceable by a

preponderance of the evidence and was not a gift, the [separate]

property shall retain its original classification."  The

converse of that provision is that when retraceable separate

property is used to purchase a gift, it no longer retains its

classification as separate property.

     As the "party claiming entitlement to rights and equities

in . . . property by virtue of an interspousal gift," husband

bore the burden of "prov[ing] the donative intent of [wife] and

the nature and extent of [her] intention."  Lightburn v.

Lightburn, 22 Va. App. 612, 616-17, 472 S.E.2d 281, 283 (1996).

See also Theismann v. Theismann, 22 Va. App. 557, 565-66, 471

                              -

S.E.2d 809, 813, aff'd, 23 Va. App. 697, 479 S.E.2d 534 (1996) (en banc).

Wife testified at the ore tenus hearing that, in 1995, she inherited $104,000 from the estates of her grandmother and mother. She deposited that money into the parties' joint savings account, then transferred it to their joint checking account. In December 1995, she purchased a brass bed. Later, using the last of her inheritance money, she purchased four hundred shares of Pershing Monument Medical Science stock (the Pershing stock).

Wife testified that using her inheritance money to buy things "was something [nice she] wanted to do" for her family. She considered the items to be "gifts for us." On wife's exhibit entitled "Property Inventory," she even listed the Pershing stock as marital.

However, in the final decree, the trial court classified the brass bed and the Pershing stock as wife's separate property.

The record proves that wife intended the brass bed and Pershing stock to be gifts for the family. Thus, the trial court erred in classifying them as separate property. We reverse and remand on this issue for the trial court to classify these items properly and to recalculate its equitable distribution award.

-

UNEQUAL DIVISION OF PROPERTY

Husband contends the trial court "erred in allocating a substantially disparate share of the marital estate to wife."

"Fashioning an equitable distribution award lies within the sound discretion of the trial judge[,] and that award will not be set aside unless it is plainly wrong or without evidence to support it." Srinivasan v. Srinivasan, 10 Va. App. 728, 732, 396 S.E.2d 675, 678 (1990). "Virginia law does not establish a presumption of equal distribution of marital assets." Matthews v. Matthews, 26 Va. App. 638, 645, 496 S.E.2d 126, 129 (1998). Because the trial court considered the factors set out in Code § 20-107.3(E), and the evidence supports its conclusions, we will not disturb its equitable distribution award merely because it is unequal. Artis v. Artis, 10 Va. App. 356, 362, 392 S.E.2d 504, 508 (1990).

For the reasons stated, we affirm in part, reverse in part and remand.

Affirmed in part,<br>reversed in part,<br>and remanded.

-