COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Huff, Judge Humphreys and Senior Judge Annunziata
Argued at Alexandria, Virginia

ANTHONY S. WILEY

                                                     MEMORANDUM OPINION[*] BY
v.       Record No. 0844-16-4               CHIEF JUDGE GLEN A. HUFF
                                                         FEBRUARY 14, 2017
MARTHA P. WILEY

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Jeanette A. Irby, Judge

Elizabeth C. Szabo (Offit Kurman Attorneys at Law, P.C., on
briefs), for appellant.

Lawrence D. Diehl (Ann Brakke Campfield; Barnes & Diehl, P.C.,
on brief), for appellee.

Anthony S. Wiley ("husband") appeals the amended final order of divorce from the

Circuit Court of Loudoun County ("trial court") awarding Martha P. Wiley ("wife") $4,500 per

month in spousal support as well as an equitable distribution award, which included the marital

residence, a sum of $45,739, and half of the balance of husband's retirement accounts as of the

date of division.  On appeal, husband raises the following eleven assignments of error to the trial

court's decision:

> 1.     The trial court erred in finding that [husband] used the
> funds in Fidelity Account (#9389) and Navy Federal Credit
> Union Accounts for improper and self-serving purposes
> given the evidence admitted at trial and pursuant to
> Virginia law existing at the time of the trial.
>
> 2.     The trial court erred in its factual findings regarding the
> funds in Fidelity Account (#9389) and Navy Federal Credit
> Union Accounts as such factual findings were unsupported
> by the evidence presented at trial.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

3. The trial court erred in the factual finding that [husband] "financed trips to various locations around the world to vacation with his fiancée," and "paid for a lavish dinner for his future mother-in-law in Israel with marital funds."

4. The trial court erred in the factual finding, "when I look at the transfers of what [husband] made from the accounts for his own purposes, many of those were to support his spare-no-expense furnishing of his apartment and for the furtherance of his adulterous affair."

5. The trial court erred in finding that Wright v. Wright, 61 Va. App. 432 did not apply to the instant case.

6. The trial court erred in granting [wife's] Motion for Alternate Valuation Date regarding Fidelity Account (#9389) and Navy Federal Credit Union Accounts.

7. The trial court erred in its equitable distribution award pursuant to Va. Code § 20-107.3(E), as the award was unsupported by the evidence presented at trial.

8. The trial court erred in its findings on the specific factors Va. Code § 20-107.3(E), including but not limited to Factors 2, 10, and 11 as said findings on the specific factors were unsupported by the evidence presented at trial.

9. The trial court erred in using its finding of fault in the dissolution of the marriage to economically punish [husband].

10. The trial court erred in its imputation of income to [wife] of only $25,000.00 as the only expert to testify at trial testified that wife could earn $75,000.00.

11. The trial court erred in its award of spousal support to [wife] based on the evidence admitted at trial and pursuant to Virginia law existing at the time of the trial.

For the following reasons, this Court affirms the trial court's rulings.

## I. BACKGROUND

"When reviewing a trial court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences."

<u>Congdon v. Congdon</u>, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003).  So viewed, a summary of the evidence presented at trial is as follows. [1]

Husband and wife married in Auburn, New York in 1992.  They had one son, K.W., who was born in September 2004.  During their twenty-two-year marriage, the parties "enjoyed a standard of living that included lavish vacations, a nice home and life style that included private school and travel team sports for [K.W.]."

As of December 2014, husband worked in sales and was earning approximately $200,000 per year in gross income and wife did not work outside the home.  Over the course of husband's career, the family relocated several times, both domestically and internationally.  Due to the nature of husband's work in sales, husband also frequently traveled away from home, often for a week or more at a time.  As a result, wife was primarily a "homemaker" but had occasionally worked outside the home in positions that would accommodate husband's schedule.  Still, prior to their separation, both husband and wife were significantly involved with K.W.'s education and extracurricular activities.  Both parties helped K.W. with homework and attended parent-teacher conferences; wife attended field trips and helped with fundraisers; and husband assisted with coaching K.W.'s baseball team, even starting a travel baseball team in 2014.  Wife testified that leading up to their separation, she had not suspected anything was wrong in their marriage and that everything appeared to be fine between her and husband.  Only one week prior to their separation, the family had vacationed in Florida for Thanksgiving and wife testified that husband seemed to be happy during the trip.

---

[1] As the parties are fully conversant with the record in this case, and because this memorandum opinion carries no precedential value, this opinion recites only those facts and incidents of the proceedings as are necessary to the parties' understanding of the appeal.

On December 7, 2014, however, husband told wife that he wanted to be alone and wanted to "push the pause button on [their] marriage." Husband declined wife's request that they seek counseling and moved into a separate bedroom until he moved out on December 21, 2014.

At least as early as January 2015, husband became romantically involved with a coworker on his sales team at InfoVista Corporation ("InfoVista"), Ana Cymerman ("Cymerman"). Husband testified that he and Cymerman had known each other since 2011. Although husband claimed that he and Cymerman did not become romantically involved until January 27, 2015, husband had purchased a couples' massage for them for January 20, 2015, and paid to upgrade her and her mother's flights on January 27th. Husband had also sent emails to Cymerman in October 2014, referring to her as "Babe" and stating "hugs back." Also notable in October 2014 was husband's return to InfoVista. By returning to InfoVista, husband left a position he'd recently secured in March 2014 at Spirant Communications, in which he'd earned $10,000 more in base income and up to $25,000 more in commission. Although husband had declined to seek marital counseling with wife, he and Cymerman began seeing a counselor for their relationship only three weeks after they purportedly became involved. On March 12, 2015, wife filed for divorce from husband.

On May 18, 2016, the trial court granted wife a divorce on the ground of adultery. In addition to the divorce, the trial court ordered the equitable distribution of assets as well as spousal and child support. The trial court also granted wife's motion for an alternate valuation date of marital assets in two accounts—husband's brokerage account at Fidelity Brokerage Services, LLC (#9389) ("Fidelity account") and the parties' jointly owned Navy Federal Credit Union checking account (#4412) ("NFCU account")—to address post-separation expenditures made by husband. As of December 2014, the balance of the Fidelity account was $262,108.92

and the balance of the NFCU account was $50,689.77. By the trial date, however, only $45,739.50 remained in the Fidelity account and the NFCU account had been closed.

As to equitable distribution, the trial court reviewed the Code § 20-107.3(E) factors and awarded wife $45,739, which was the balance of the Fidelity account, as well as the marital residence and half of husband's retirement accounts as of the date of their division. In so ruling, the trial court found that although each initially contributed to the well-being of the family, as of their separation husband had made negative contributions to the maintenance of the marital property and to the family's well-being.

As to spousal support, the trial court reviewed the Code § 20-107.1(E) factors and awarded wife $4,500 per month in spousal support, imputing $25,000 per year in income. In so ordering, the trial court reasoned that husband and wife enjoyed a high standard of living, that husband made a significant income and wife did not, and that wife is not "in a position to make more than $25,000 at the present time, based upon the length of time that she has been out of the job market and . . . [K.W.'s] needs."

Husband objected to the equitable distribution and spousal support awards. This appeal followed.

## II. STANDARD OF REVIEW

"In reviewing [husband's] assignments of error, we are guided by the principle that decisions concerning equitable distribution and spousal and child support rest within the sound discretion of the trial court and will not be reversed on appeal unless plainly wrong or unsupported by the evidence." Floyd v. Floyd, 17 Va. App. 222, 224, 436 S.E.2d 457, 458 (1993). Questions of statutory interpretation "are questions of law, which [this Court] review[s] *de novo*." Riverside Healthcare Ass'n v. Forbes, 281 Va. 522, 528, 709 S.E.2d 156, 159 (2011). "A trial judge 'would necessarily abuse [his] discretion if [he] based [his] ruling on an erroneous

view of the law or on a clearly erroneous assessment of the evidence.'"  Bomar v. Bomar, 45

Va. App. 229, 236, 609 S.E.2d 629, 632 (2005) (alterations in original) (quoting Cooter & Gell

v. Hartman Corp., 496 U.S. 384, 405 (1990)).

## III.  ANALYSIS

### A.  Equitable Distribution Award

Husband assigns error to nine aspects of the equitable distribution award, which he

groups as follows:

> 1.  The trial court erred in its interpretation of waste, including its finding that Wright v. Wright, 61 Va. App. 432, 737 S.E.2d 519 (2013), did not apply to the instant case.
>
> 2.  The trial court erred in its factual findings regarding the funds in Fidelity account (#9389) and NFCU account (#4412) and the resulting equitable distribution award was unsupported by the evidence presented at trial.
>
> 3.  The trial court erred in its use of fault in the dissolution of the marriage to economically punish husband.

Each grouping is addressed in turn with additional facts provided as necessary to the analysis.

### 1.  Wright v. Wright

In his first group, husband asserts that the trial court erred when it distinguished this

Court's decision in Wright.  Specifically, husband contends that, contrary to Wright, the trial

court erroneously ruled that his expenditure of marital assets instead of post-separation income

on expenses such as spousal support or living expenses constituted waste.

The following additional facts are relevant to this assigned error.  In accordance with a

*pendente lite* order entered by the trial court July 20, 2015, husband paid the mortgage, spousal

support, tuition for K.W., and other support expenses from the Fidelity account.  That account,

however, had been depleted by more than $200,000 by the time of the hearing.  In addition, the

NFCU account, which contained over $50,000 as of December 2014, had been completely

depleted and was closed as of September 2015. Included among the expenditures from both accounts during this time were substantial credit card payments to husband's credit cards and transfers of over $21,000 from the NFCU account to husband's personal checking account. Expenses that husband had charged to his credit cards included travel for Cymerman and her mother, expensive gifts, couple's counseling for husband and Cymerman, and all of the living expenses for him and Cymerman.

In light of this evidence, the trial court stated the following:

> [T]he reason why I ordered the relief for alternate valuation is so as to avoid an inequitable result. The [trial court] finds that the funds on the accounts were used for both improper purpose and a self-serving purpose. The [trial court] distinguishes the case of Wright v. Wright, 61 Va. App. 432. In that case the husband had already paid the wife $525,000 in separate funds. Certainly not a factor in this case.
> Additionally, when I look at the transfers of what Mr. Wiley made from the accounts for his own purposes, many of those were to support his spare-no-expense furnishing of his apartment and for the furtherance of his adulterous affair.

For the following reasons, this Court finds the trial court did not abuse its discretion in distinguishing Wright.

There are only "two categories of post-separation expenditures of marital assets: (1) expenditures for proper purposes, and (2) waste." Wright, 61 Va. App. at 465, 737 S.E.2d at 535. "Once the aggrieved spouse shows that marital funds were either withdrawn or used after the breakdown, the burden rests with the party charged with dissipation to prove that the money was spent for a proper purpose." Clements v. Clements, 10 Va. App. 580, 586, 397 S.E.2d 257, 261 (1990).

> [T]he burden is on the party who last had the funds to establish by a preponderance of the evidence that the funds were used for *living expenses or some other proper purpose*. If the party is unable to offer sufficient proof, the court must value the property at a date other than the date of the evidentiary hearing so as to achieve an equitable result.

Id. at 587, 397 S.E.2d at 261 (emphasis added); see also Anderson v. Anderson, 29 Va. App. 673, 694-95, 514 S.E.2d 369, 380 (1999) ("As husband . . . withdrew the marital funds at issue and put them into an account under his sole dominion and control, husband had the burden to establish by a preponderance of the evidence that the funds were used for a proper purpose.").

In Wright, this Court affirmed a trial court's denial of a wife's motion for an alternate valuation date of two marital accounts. 61 Va. App. at 441, 737 S.E.2d at 523. On appeal, the wife argued that the husband had unfairly diminished the marital accounts, albeit on proper expenditures such as the mortgage or spousal support, rather than expending his separate funds. Id. at 462 nn.16-17, 465, 737 S.E.2d at 533-34 nn.16-17, 535. Notably, wife "recognized in the trial court and recognize[d] on appeal . . . that the *waste* of marital assets ha[d] not been established." Id. at 464-65, 737 S.E.2d at 535 (emphasis added). Indeed, the facts demonstrated that husband had also "paid wife $525,000 from his own separate funds for her share of the marital home." Id. at 467, 737 S.E.2d at 536. Finding that after separation, there are only two types of expenditures of marital assets, this Court held that the trial court is not required to consider the extent of a spouse's post-separation income or other separate assets "in determining whether [that spouse] unfairly diminished marital assets." Id. at 466, 737 S.E.2d at 535. Because marital assets were not wasted, the trial court did not abuse its discretion when it denied the request for an alternate valuation date for the marital accounts. Id. at 467, 737 S.E.2d at 536.

By contrast, in this case wife claims that husband wasted *marital* assets and Wright is, therefore, distinguishable. Essential to this Court's holding in Wright was wife's concession that husband did *not* waste marital assets. Here, however, wife offered evidence, which the trial court found credible, that husband used marital funds to pay for expenses incurred in the "furtherance of his adulterous affair." Although some of the funds husband withdrew from the parties' NFCU and Fidelity accounts paid the mortgage and wife's spousal support, not all of the

marital funds were traced to such proper purposes. Therefore, the trial court did not abuse its discretion in considering whether any of husband's expenditures of marital funds "unfairly diminished marital assets." Wright, 61 Va. App. at 466, 737 S.E.2d at 535.

### 2. Evidence to support the equitable distribution award

In his second group, husband argues that the trial court erred when it found that he improperly dissipated marital assets. Husband specifically challenges the trial court's review of factors 2, 10, and 11 of Code § 20-107.3(E) and the court's accompanying factual findings that: (1) husband used marital funds for improper and self-serving purposes, (2) husband financed vacations with Cymerman and paid for an expensive dinner for Cymerman's mother with marital funds, and (3) husband used marital funds to "support his spare-no-expense furnishing of his apartment and for the furtherance of his adulterous affair."

The following additional facts are relevant to this assigned error. From January to December 2015, husband paid over $80,000 on an American Express card (account #8009) and over $40,000 on his Barclay's Visa Black card (account #1034) from the NFCU and Fidelity accounts. Additionally, from February to September 2015, husband transferred over $21,000 of marital funds from the NFCU account to his separate checking account, out of which husband paid several thousands in additional credit card charges.

Throughout 2015, using various credit cards, husband paid over $1,500 for a trip to Malaysia with Cymerman and her mother, over $2,700 on a birthday dinner for Cymerman's mother in August 2015, the travel expenses for Cymerman and her mother to Texas and Israel, the travel expenses for himself and Cymerman to the Dominican Republic in May 2015, and for couple's counseling sessions for himself and Cymerman. Cymerman testified that throughout 2015, she traveled with husband fifteen to twenty times for business and pleasure reasons. She paid for none of the expenses, and husband received reimbursements from his employer for

- 9 -

some, but not all, of the expenses. Husband also admitted to spending over $4,000 on one television in December 2014, and over $20,000 at several furniture stores to furnish his apartment. Even after Cymerman began living with husband in April 2015, she did not contribute to any of their living expenses, which included furniture, rent, utilities, and groceries.

In light of this evidence, in addition to personal property, the trial court awarded wife $45,739, the marital home, as well as half of husband's retirement funds. By contrast, husband was awarded the NFCU and Fidelity accounts and some personal property but was not awarded any portion of wife's retirement accounts.

"Code § 20-107.3 contains no presumption favoring equal division of marital property." Aster v. Gross, 7 Va. App. 1, 8, 371 S.E.2d 833, 837 (1988). "The purpose of Code § 20-107.3 is to divide fairly the value of the marital assets acquired by the parties during marriage with due regard for both their monetary and nonmonetary contributions to the acquisition and maintenance of the property and to the marriage." O'Loughlin v. O'Loughlin, 20 Va. App. 522, 524, 458 S.E.2d 323, 324 (1995). Included among the factors that the trial court must consider are

> (2) [t]he contributions, monetary and nonmonetary, of each party in the acquisition and care and maintenance of such marital property of the parties;
> . . . .
> (10) [t]he use or expenditure of marital property by either of the parties for a nonmarital separate purpose or the dissipation of such funds, when such was done in anticipation of divorce or separation or after the last separation of the parties; and
> (11) [s]uch other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable monetary award.

Code § 20-107.3(E).

In this case, the trial court's equitable distribution ruling and accompanying findings were supported by credible evidence. Although, as husband contends, "many of the[] expenses" of marital funds were proper, there was sufficient evidence for the trial court to find that a

significant amount of the marital funds was expended for improper purposes. Specifically, the travel expenses, expensive dinner, and substantial living expenses to support his relationship with Cymerman that husband charged to his credit cards were not paid solely out of husband's post-separation income or assets, but instead out of either his personal checking account, in which he had deposited over $21,000 in marital funds, or directly out of the NFCU and Fidelity accounts. Husband did not trace all of his withdrawals of marital funds solely to proper purposes; thus the trial court could properly find that husband failed to meet his burden of accounting for all of the marital funds. As such, this Court finds that the resulting equitable distribution decision was not plainly wrong or without evidence to support it.

### 3. Fault

In his third group, husband argues that the trial court erred because it used the equitable distribution award to punish him. Specifically, husband contends that the trial court erred when it considered the effect of his adultery in its equitable distribution award because he contends that none of his actions had an economic impact on the marital estate.

The following additional facts are relevant to this assigned error. In its equitable distribution ruling, the trial court found that "husband made significant negative contributions towards the end of the marriage." While husband freely spent thousands of dollars on furniture, vacations, and gifts for Cymerman, he was reluctant to continue supporting wife and K.W. Husband told wife he would have to wait before paying K.W.'s fees for sports lessons and summer camps, stating that he needed to first "determine his financial situation" before committing to anything. In April 2015, husband refused to pay for K.W.'s continued enrollment in private school because he did not "fully understand [his] financial position" regarding their divorce. In May 2015, husband also stated that he would not pay for any additional household expenses, including vehicle maintenance and household repairs, explaining in bold italicized

- 11 -

terms that the cost for these should be paid out of the $1,800 monthly stipend he had given wife for food, gas, and other regular household expenses for her and K.W. Further, in October 2015, husband told wife that he could not *afford* to attend K.W.'s tournament games in Pennsylvania.

Moreover, wife had testified to K.W.'s distress over husband moving out and that when husband told K.W. that he was leaving, K.W. began crying, told him he no longer wanted to play baseball, and asked husband why he was "breaking up [their] family?" Additionally, the relationship counselor for husband and Cymerman, John Gingras ("Gingras"), had testified that Cymerman regularly complained that husband spent "too much time" with K.W. and that husband's involvement parenting K.W. was interfering with the progression of her relationship with husband. Further, husband admitted that in August 2015 he had missed at least one scheduled visitation time with K.W. because he had been on vacation with Cymerman and her mother, and other scheduled times for visitation due to work commitments.

In addition to this evidence, the trial court took note of husband's abrupt departure from the family following their Thanksgiving family vacation, and of the fact that husband had changed jobs in October 2014 to a lower paying position, which was also the "employer of his fiancée Cymerman." The trial court further found that husband's "lack of discretion and consideration" in how publicly he and Cymerman displayed their relationship among friends and family, including having Cymerman spend the night during an overnight visitation with K.W. in March 2015, "shocked the conscience of the court." For the following reasons, this Court affirms the trial court's consideration of the negative impact of husband's affair.

"[W]hile equitable distribution is not a vehicle to punish behavior, the statutory guidelines authorize consideration of such behavior as having an adverse effect on the marriage and justifying an award that favors one spouse over the other." O'Loughlin, 20 Va. App. at 527, 458 S.E.2d at 325. Code § 20-107.3(E)(5) instructs the trial court to consider "[t]he

circumstances and factors which contributed to the dissolution of the marriage, specifically including any ground for divorce" when constructing an equitable award. Code § 20-107.3(E)(1) also provides that the trial court may consider the nonmonetary "negative impact of [an] affair on the well-being of the family." O'Loughlin, 20 Va. App. at 527-28, 458 S.E.2d at 326 (quoting Smith v. Smith, 18 Va. App. 427, 431, 444 S.E.2d 269, 273 (1994)). The General Assembly has specifically directed the trial court to consider "[t]he contributions, monetary *and nonmonetary*, of each party to the well-being of the family" as well as the factors that contributed to the dissolution of the marriage when making an equitable apportionment of their assets and liabilities. See Code § 20-107.3(E)(1), (5) (emphasis added). "Consideration of nonmonetary contributions to the well-being of the family under Code § 20-107.3(E)(1) requires no showing of an adverse economic impact." Watts v. Watts, 40 Va. App. 685, 699, 581 S.E.2d 224, 231 (2003).

In this case, the trial court did not abuse its discretion when it considered the impact, economic and otherwise, that husband's affair had on the family's well-being. In addition to husband's dissipation of assets in the NFCU and Fidelity accounts, wife testified to the distress husband caused K.W. by leaving immediately after their family vacation. Gingras further testified to husband being pressured by Cymerman to advance their relationship at the expense of his relationship with his son. There was also evidence that husband returned to a lower paying position where he could work with Cymerman at a time when he was familiar enough with her to refer to her as "Babe." Further, while husband spent considerable funds on Cymerman and her mother, husband refused to pay for the additional repairs and maintenance needed for the marital home, to attend a tournament game in which K.W. participated, for K.W.'s team sports' fees, or for K.W.'s private school tuition "until other financial obligations had been determined." Therefore, the trial court did not abuse its discretion in finding that husband's affair negatively

- 13 -

impacted the family, both financially and with regards to their well-being, and for it to make a distribution of their assets accordingly.

## B. Spousal Support Award

With regards to spousal support, husband grouped his remaining two assignments of error as follows: "The trial court erred in its imputation of $25,000 of income to wife as unsupported by the evidence presented at trial." In this final group, husband challenges the trial court's rejection of his expert's testimony that wife could earn as much as $75,000 annually.

The following additional facts are relevant to this assigned error. Wife has a degree in hospitality management but from 1996 to 1999 and again from 2003 to 2007, wife did not work due to visa restrictions while the family lived outside the United States. Within the United States, wife held various part-time and full-time sales positions that would accommodate husband's and K.W.'s schedules. From 2007 until 2010 wife worked for National Corporate Housing ("NCH") primarily overseeing sales and some operations for the company. While employed by NCH, wife earned $37,730 in 2007; $92,469 in 2008; $116,255 in 2009; and $62,963 in 2010. After being laid off from NCH in 2010, wife worked for an assisted living facility as the community affairs director from 2011 to 2012, and then for PI Midlantic in sales from 2012 to 2013. Wife's reported earnings in these positions were $24,738 in 2011, $22,785 in 2012, and $7,641 in 2013. At the time of their separation in 2014, husband was averaging $200,000 per year in gross income and wife stayed at home by agreement of the parties.

On the issue of spousal support, husband argued for the trial court to impute income to wife and called Anthony Kurtis Byrd ("Byrd"), a vocational counselor, to testify to wife's earning capacity. Byrd qualified as an expert in vocational rehabilitation, vocational counseling, vocational assessment, and job placement. He testified that based on wife's resume, LinkedIn profile, and deposition testimony, wife was employable at $75,000 per year and that it would

- 14 -

take about five months for her to secure a position in marketing, management, or training within the hospitality industry. Byrd also suggested a few currently available positions in the hospitality industry and testified that according to the United States Department of Labor, marketing specialists earn $75,000 annually.

On cross-examination, however, Byrd did admit that wife's employability would be hindered by the five years she had not been working in hospitality or marketing and because she was fifty years old—two factors that could not be accounted for with any degree of certainty. He also admitted that he was not familiar with the salaries offered or training required for the positions he had suggested and that some of those positions may include travel that wife may not be able to accept. Byrd further acknowledged that he could not account for any work restrictions that would be associated with wife's commitments to K.W.

As a result, the trial court awarded wife $4,500 per month in spousal support, imputing $2,083 per month, or $25,000 per year, of income to her. The trial court noted that "husband's expert indicated that 50 is a game changer with respect to re-entering the workforce." The trial court also noted that several of the positions recommended by Byrd were not necessarily in wife's field nor appropriate for wife's schedule limitations. The trial court further found the evidence did not sufficiently address the extent of further training wife would need before she could expect to earn $75,000 per year, considering her age and that she had been out of her field for a significant period of time. The trial court then concluded that based on wife's most recent earnings and needed flexibility, wife could find a position earning $25,000 per year. For the following reasons, this Court affirms the trial court's ruling.

"The decision to impute income is within the sound discretion of the trial court and its refusal to impute income will not be reversed unless plainly wrong or unsupported by the evidence." DeCamp v. DeCamp, 64 Va. App. 137, 149, 765 S.E.2d 863, 869 (2014) (quoting

- 15 -

McKee v. McKee, 52 Va. App. 482, 489, 664 S.E.2d 505, 509 (2008) (*en banc*)).  "The party seeking imputation . . . 'is required to present evidence "sufficient to enable the trial judge reasonably to project what amount [of income] could be anticipated."'" Id. at 150, 765 S.E.2d at 870 (alteration in original) (quoting McKee, 52 Va. App. at 490, 664 S.E.2d at 510).  "[T]he circuit court 'must look to current circumstances and what the circumstances will be within the immediate or reasonably foreseeable future, not to what may happen in the future.'" Id. at 150-51, 765 S.E.2d at 870 (quoting McKee, 52 Va. App. at 490, 664 S.E.2d at 509).  Moreover,

> [i]t is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony.  Further, the fact finder is not required to accept the testimony of an expert witness merely because he or she has qualified as an expert.

Street v. Street, 25 Va. App. 380, 387, 488 S.E.2d 665, 668 (1997).

In this case, the trial court did not abuse its discretion in imputing $25,000 per year of income to wife, despite the testimony of husband's expert.  Byrd was unable to specify the salaries for the available positions or the amount of travel each position would require.  Additionally, the evidence suggested that wife would need to invest in further training before she could qualify for those positions because they differed from the sales work in which wife had been primarily engaged.  Furthermore, Byrd admitted that the $75,000 figure suggested could not account for wife's age or the flexibility she would need to accommodate K.W.'s school and sports schedules.  Considering that wife's more recent earnings yielded approximately $25,000 in annual income, there was sufficient evidence for the trial court to impute this amount in income to wife.  The trial court was not required to simply accept Byrd's testimony in lieu of all other evidence submitted.  For these reasons, the trial court did not abuse its discretion in the amount of income it imputed to wife.

## IV. CONCLUSION

For the foregoing reasons, this Court affirms the equitable distribution and spousal support awards of the trial court.

<u>Affirmed.</u>